**UNITED STATES of America,
Appellee,**

v.

**Mark Lawrence ALTER, Appellant.**

**No. 73–1121.**

United States Court of Appeals,
Ninth Circuit.

July 23, 1973.

Susan B. Jordan, Atty. (argued), of Cummings & Jordan, San Francisco, Cal., Doron Weinberg (argued), of Stender & Lapides, San Francisco, Cal., for appellant.

Robert L. Keuch (argued), A. William Olson, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., James L. Browning, Jr., U. S. Atty., David P. Bancroft, Asst. U. S. Atty., San Francisco, Cal., William M. Piatt, Dept. of Justice, Washington, D.C., for appellee.

## OPINION

Before MERRILL, HUFSTEDLER, and GOODWIN, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Alter appeals from a civil contempt adjudication stemming from his refusal to answer three questions asked by a special federal grand jury investigating potential violations of a potpourri of federal statutes.[1] We vacate and remand.

Of the many issues presented on appeal, we reach four:

1. Did the district court abuse its discretion by compelling Alter to respond to contempt charges without affording him a reasonable time adequately to prepare his defense and without giving him the uninhibited adversary hearing required by 28 U.S.C. § 1826(a) and Rule 42(b) of the Federal Rules of Criminal Procedure?

2. Were Alter's averments of illegal electronic surveillance of his counsel adequate to compel Government affirmation or denial under Gelbard v. United States (1972) 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179.

3. Was the Government's response to Alter's averments that the Government had placed Alter under illegal electronic surveillance sufficient to avoid an evidentiary hearing directed to the issue?

4. Was use immunity granted to Alter pursuant to 18 U.S.C. § 6002 non-coextensive with his Fifth Amendment right against self-incrimination because the immunity conferred failed to protect him from prosecution for false statements under 18 U.S.C. § 1001, based on an interview with an F.B.I. agent prior to his grand jury appearance?

Alter first appeared before the grand jury on November 13, 1972. Invoking his Fifth Amendment privilege against self-incrimination, he declined to answer several questions. On January 16, 1973, the Government applied for and was granted an order conferring on him use

---

1. These statutes included: 18 U.S.C. § 1001 (false statements), 7 U.S.C. § 2023(b) (unauthorized acquisition of food coupons), 26 U.S.C. § 5861 (1968 Gun Control Act), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 2113 (bank robbery and incidental crimes), 50 U.S.C.App. § 462(b)(6) (selective service), 18 U.S.C. § 842, et seq. (manufacture and possession of explosives), and 18 U.S.C. § 371 (conspiracy).

and derivative use immunity pursuant to 18 U.S.C. §§ 6002, 6003. Alter unsuccessfully objected to the immunity application on several grounds, including *inter alia* his lack of protection from potential prosecution based on statements he had made to the F.B.I. long before his grand jury appearance.

Alter was recalled on January 17, 1973. The grand jury forbade him to take notes and limited him to three minutes for consultation with counsel. Citing the restrictions imposed by the grand jury, he refused to answer, and a procedural skirmish followed. The grand jury had previously sought and been given secret instructions about their authority to impose restrictions on the witness. When Alter learned of these instructions, he moved the district court to disclose the special instructions and renewed his earlier motions to disclose all of the court's instructions to the grand jury and to propound his requested instructions to the grand jury. The district court disclosed the general and special instructions [2] but denied the other motions. The Government filed an affidavit at 4:45 p. m. on January 17, 1973, stating that Alter continued his refusal to cooperate and asking for the issuance of a contempt order. Oral argument continued to the conclusion of the court day.

On January 18, 1973, the grand jury again asked Alter three questions, in substance, as follows:

1. Did you acquire a passenger car registration in Illinois on February 17, 1970?

2. Did you ever visit a named San Francisco address?

3. Do you have any notion as to why identification bearing your name might have been located at that San Francisco address?

He declined to answer on several grounds, including claimed illegal electronic surveillance of himself and his counsel, his Fifth Amendment right, claimed prejudice from failure to disclose all of the court's instructions to the grand jury and refusal to give his requested instructions, a challenge to the composition of the grand jury, and the impropriety of the third question.[3] At the Government's request and over Alter's multiple objections, the court held a contempt hearing within 45 minutes after Alter's declination to respond to the three questions. The Government filed an affidavit purporting to disclaim any electronic surveillance of Alter, but it filed no response to Alter's affidavits averring illegal electronic surveillance of Alter's counsel. The district court, without an evidentiary hearing, forthwith held Alter in contempt, and this appeal followed.

### I.

The statutory authority for the contempt adjudication is 28 U.S.C. § 1826(a) which, in pertinent part, provides:

"Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify . . . , the court, upon such refusal, or when such refusal is duly brought to its attention, may *summarily* order his confinement . . . until such time as the witness is willing to give such testimony . . . ." (Emphasis added.)

The word "summarily" evokes the concept of direct criminal contempt,[4] but

2. The special instructions concerned the authority of the grand jury to restrict consultation with counsel and to forbid note taking. The propriety of these instructions is not challenged on appeal.

3. Because we vacate on other grounds, we do not reach the question of standing of a grand jury witness to challenge the racial and ethnic composition of the grand jury or the propriety of the third question.

4. *Compare* Fed.R.Crim.P. 42(a): "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual pres-

the Supreme Court has effectively banished that impression. The Court's interpretation of section 1826(a) emerges from three cases: Gelbard v. United States (1972) 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179, decided after section 1826(a) was enacted; Shillitani v. United States (1966) 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622, and Harris v. United States (1965) 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240, both decided before the passage of section 1826(a).

The law of contempt has long been a morass because the contempt label has been pinned to highly diverse actions and offenses. Before *Shillitani* and *Harris*, confusion was rampant about the nature of contempts emerging from grand jury witnesses' refusals to respond to questions that they had been ordered to answer. Depending upon the characterization of such contempts, the recalcitrant witness might be subject (1) to summary punishment, (2) to a criminal trial, with all of the procedural safeguards usually attendant thereon, including a right to trial by jury, or (3) to civil procedures, sans jury trial, ordinarily available in civil litigation.

In *Harris*, an immunized grand jury witness, asserting his Fifth Amendment privilege against self-incrimination, refused to answer the grand jury's questions after the court ordered him to do so. The court held him in direct criminal contempt, invoking the summary procedure prescribed by Rule 42(a) of the Federal Rules of Criminal Procedure. The Supreme Court reversed, holding that summary contempt (Rule 42(a)) was limited to " 'misbehavior' " in the " 'actual presence of the court' "

(382 U.S. at 164, 86 S.Ct. 352) and that the "normal procedure" for compelling a recalcitrant grand jury witness to testify was set forth in Rule 42(b) of the Federal Rules of Criminal Procedure.[5] (382 U.S. at 165–167, 86 S.Ct. 352.)

The question whether a grand jury witness' contempt was civil or criminal was not reached until *Shillitani*. In *Shillitani* two immunized grand jury witnesses, like Harris, refused to answer questions and were imprisoned until they purged themselves. Both witnesses were subjected to Rule 42(b) proceedings; both demanded and were refused trial by jury. The Supreme Court held that the contempt should be characterized as civil for the purpose of determining the right to jury trial.

Then came *Gelbard*, which involved three grand jury witnesses—Gelbard who appeared before a federal grand jury in California and Egan and Walsh who appeared before a Pennsylvania grand jury. Each witness claimed that illegal wiretapping infected his interrogation before the grand jury and that the infection supplied "just cause" under section 1826(a) to refuse to answer the grand jury's questions. Each was held in contempt from which appeal was taken.

The Government admitted the interceptions of *Gelbard*; it neither admitted nor denied interceptions affecting Egan and Walsh. The Ninth Circuit affirmed Gelbard's contempt adjudication on the ground that he had no standing to raise the issue in a preindictment proceeding.[6] However, the Third Circuit reached a contrary result, overturning the Egan and Walsh contempts.[7] The Supreme

---

ence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record."

5. "A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. . . ."

6. United States v. Gelbard (9th Cir. 1971) 443 F.2d 837.

7. In re Grand Jury Proceedings, Harrisburg, Pennsylvania (Egan) (3d Cir. 1971) 450 F.2d 199; In re Grand Jury Proceedings, Harrisburg, Pennsylvania (Walsh) (3d Cir. 1971) 450 F.2d 231.

Court agreed with the Third Circuit. It held that wiretapping, which was illegal under 18 U.S.C. § 2515 and which could affect the interrogation of a grand jury witness, was "just cause" under 28 U.S.C. § 1826(a) for the witness' refusal to answer the grand jury's questions after the court ordered response.

■ At the threshold of *Gelbard*, the Court said that section 1826(a) was "intended to codify the existing practice of the federal courts," citing portions of its legislative history and *Shillitani* (408 U.S. at 42–43 n. 1, 92 S.Ct. at 2358). The unmistakable import of these observations is that section 1826(a) has no effect upon the procedural ground rules the Court had laid in cases anteceding that the enactment of the statute—rules which expressly forbade summary proceedings for such contempts.[8]

A cloud on the procedural horizon is the harmonizing of *Shillitani* and *Harris*. Neither *Gelbard* nor *Shillitani* mentions *Harris*, although *Shillitani* arose from a Rule 42(b) proceeding. Does *Shillitani's* characterization of grand jury contempt as "civil" for the purpose of determining a right to jury trial mean that *Harris'* application of Rule 42(b) of the Federal Rules of Criminal Procedure to grand jury witnesses silently fell? We think not. *Shillitani*

and *Harris* are consistent unless the labels "criminal" and "civil" are immutable legal compartments, forever hermetically sealed from each other, embodying mutually exclusive procedural and constitutional rules.

The Supreme Court has abandoned the idea that actions or proceedings must be wholly civil or wholly criminal and that the choice of one label inexorably sets the case on a single procedural or constitutional track. On the contrary, the Court has repeatedly recognized that many kinds of cases are hybrids and that, even in those in which criminal aspects overshadow the civil, flexible due process standards permit variations in procedure designed to accommodate real differences among classes of cases. Illustrations abound,[9] one of the more recent of which is Morrissey v. Brewer (1972) 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, according a parolee in a parole revocation proceeding "such procedural protections as the particular situation demands" (*id.* at 481, 92 S.Ct. at 2600), but not "the full panoply of rights due a defendant" in an ordinary criminal prosecution (*id.* at 480, 92 S.Ct. at 2600). *Cf.* Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 1973).

■ Following the teaching of the Supreme Court drawn from this mosaic of

---

8. The Third Circuit in *Egan* apparently reached a similar conclusion, although its decision did not turn upon the procedural antecedents of the contempt. The court noted the unseemly haste which marked the contempt adjudication and added: "No request was made by the Government, and no explanation was given for not making such request to shorten the 5-day requirement of Rules 5(a), 5(b) and 6(d) of the Federal Rules of Civil Procedure." (450 F.2d at 200–201, 201 n. 4. Citation omitted.)

9. *E. g.*, contempt: Bloom v. Illinois (1968) 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (jury trial guaranteed for serious criminal contempts) ; Cheff v. Schnackenberg (1966) 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (jury trial not guaranteed for petty criminal contempts) ; juvenile: McKeiver v. Pennsylvania (1971) 403 U.S.

528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (rejecting the "wooden approach" of decision by the "civil" or "criminal" label, 403 U.S. at 541, 91 S.Ct. 1976, and holding that due process did not compel states to grant jury trials to juveniles charged in delinquency proceedings) ; In re Winship (1970) 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (juvenile delinquency proceedings are sufficiently criminal to require proof beyond a reasonable doubt) ; In re Gault (1967) 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (such proceedings are sufficiently criminal to require minimum criminal due process guaranties) ; mental illness : Specht v. Patterson (1967) 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (whether denominated civil or criminal, commitment of the mentally ill is subject to the safeguards of the due process and equal protection clauses).

cases, we conclude that a proceeding in contempt to compel a federal grand jury witness to testify is civil enough to foreclose his claim that he has a constitutional right to trial by jury (*Shillitani*) and criminal enough to require the application of Rule 42(b) (*Harris*), a conclusion we reached less elaborately in United States v. Dinsio (9th Cir. 1972) 468 F.2d 1392. It follows, therefore, that Alter was entitled to notice prescribed by Rule 42(b) and to a reasonable time to prepare his defense, *i. e.*, to show "just cause" for refusing to respond.

■ The determination of how much time is reasonable is committed to the sound discretion of the district court. As we learned from *Harris*, however, the proceedings cannot be conducted summarily, and in no event can the time be reduced below a minimum needed adequately to prepare a defense. A reasonable time will vary according to the circumstances of each case. When the alleged contemnor's defense raises legal issues of some complexity or there is an indication that an evidentiary hearing may be required to resolve factual issues, the five-day notice period prescribed by Rule 45(d) of the Federal Rules of Criminal Procedure (Rule 6(d) of the Federal Rules of Civil Procedure) should be adopted as the standard, absent a showing by the Government of some compelling need to shorten time and absent a showing by the contemnor of some reason why a longer time is needed to prepare the defense.[10] (*Compare* In re Grand Jury Proceedings (Egan), *supra* note 7, 450 F.2d at 201 n. 4.)

■■ Compelling need for reducing time is not shown by the fact alone that the alleged contemnor is a witness in a pending grand jury investigation; were it otherwise, a grand jury witness could be routinely denied standard notice. Orderly presentation of evidence to a grand jury, without undue delay and interruption, is an important consideration in the effective administration of federal criminal justice. That interest must nevertheless yield to the paramount due process right of a potential contemnor to have adequate notice and a fair opportunity to defend himself.[11] In some cases all the important issues will have been

---

10. Contempt proceedings against grand jury witnesses can and often do present complex issues of law and fact in which constitutional questions of major import are a concomitant. (*E. g.*, Branzburg v. Hayes, In re Pappas, and United States v. Caldwell (1972) 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626; Bursey v. United States (9th Cir. 1972) 466 F.2d 1059.) A failure to enlarge notice time when confronted with serious and challenging issues would be an abuse of discretion. A fortiori a reduction of standard notice time in complicated cases would be an abuse of discretion.

11. *Cf.* Brotherhood of Locomotive Firemen & Enginemen v. United States (5th Cir. 1969) 411 F.2d 312.
 Solicitude for the due process rights of contemnors is hardly neoteric. In Cooke v. United States (1925) 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767, Chief Justice Taft said:
 "Due process of law . . . in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed." (Citations omitted.)

 The concern is unabated. *E. g.*, United States v. Sun Kung Kang (9th Cir. 1972) 468 F.2d 1368 (indigent contemnor's right to counsel); Bloom v. Illinois (1968), *supra* note 9 (explicating the rules governing the right to trial by jury in criminal contempts); In re Green (1962) 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198 (contempt conviction in state court without a hearing and without opportunity to establish legal defense violates the due process clause of the Fourteenth Amendment); In re Oliver (1948) 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (state contempt conviction held in secret and without reasonable notice of the charge, right to examine witnesses, right to testify in one's own behalf, and right to counsel constitutes a denial of due process of law).

raised by the time of the immunity hearing, and it will be apparent that the actual contempt can raise no new issues. If so, the witness may have had adequate time to prepare even though very little time elapses between the alleged contempt and the contempt hearing. *Cf.* United States v. Weinberg (9th Cir. 1971) 439 F.2d 743. The burden for this showing likewise falls on the Government.[12]

■ Alter made his requisite showing that the legal issues were not simple and that full resolution of the controversy could require an evidentiary hearing. The Government, on the other hand, gave no reason for haste. Under these circumstances, the failure of the district court to give him five days within which to prepare his defense was an abuse of discretion.

■ Moreover, the hearing Alter received was not the "uninhibited adversary hearing" contemplated by section 1826(a). (United States v. Dinsio, *supra*, 468 F.2d at 1394.) The hearing was largely confined to the perfunctory reception of affidavits, a round of oral argument, and some offers for the record. That "uninhibited adversary hearing" recognized by *Harris* and most recently reaffirmed by *Dinsio* requires, at the very least, that a witness be allowed to probe all nonfrivolous defenses to the contempt charge. The constitutional guarantee of due process of law means more than a silhouette of justice; it requires that judicial determinations affecting the freedom of the individual be openly arrived at after full, fair, and vigorous debate on both sides of all substantial issues. " 'The fundamental requisite of due process of law is the opportunity to be heard.' . . . The hearing must be 'at a meaningful time and in a meaningful manner.' " Goldberg v. Kelly (1970) 397 U.S. 254, 267, 90 S.Ct.

1011, 1020, 25 L.Ed.2d 287 (citations omitted); *cf.* Morrissey v. Brewer, *supra*; Fuentes v. Shevin (1972) 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556; Sniadach v. Family Finance Corp. (1969) 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349.

A careful review of the entire record leads us to conclude that Alter was deprived of a meaningful opportunity to present his defense. The court exhibited exemplary courtesy toward the parties. To a large extent the court's decision to limit the contest resulted from an erroneous view of some of the complex and novel legal questions presented —error which is unlikely to be repeated on remand.

## II.

We are urged to decide whether, in the wake of *Gelbard*, a grand jury witness has standing to claim as a defense to civil contempt under 28 U.S.C. § 1826(a) that his counsel was subjected to illegal electronic surveillance. The threshold question, however, is whether appellant's allegations of illegal surveillance were adequate to require the Government to affirm or deny.

Appellant submitted three affidavits bearing on the possible existence of illegal interception of telephone conversations of his counsel. Doron Weinberg, one of appellant's attorneys, alleged that (1) he had been representing Alter continuously since September 30, 1972; (2) on the afternoon of November 6, 1972, he attempted to place a telephone call from his office (telephone numbers and address mentioned); (3) after dialing and waiting several seconds for a connection, he "detected only a 'hollow' sound, as though the line were open" and after several more seconds, he "heard what sounded distinctly like a human cough"; (4) he and his asso-

---

12. In re Russo (9th Cir. 1971) 448 F.2d 369 and United States v. Robinson (9th Cir. 1971) 449 F.2d 925 are consistent with our holding; in both cases, the contempt hearing was preceded by a week's notice. United States v. Fitch & Meisel (9th Cir. 1973) 472 F.2d 548 and United States v. Taulbee & Taulbee (9th Cir. 1973), 476 F.2d 804 concluded that lesser notice was adequate, but the circumstances are not disclosed by the opinions.

ciate, Marvin Stender, "clearly heard a short series of clicking sounds, like a receiver being lifted and put down"; (5) at the time no one was using any extension in the office; (6) on the afternoon of November 9, 1972, a call again did not go through, and after several seconds' wait, "there was a noise very much like that of a person clearing his or her throat"; (7) the phone then "clicked and the line went dead"; (8) based on these two incidents, he believed that "there is some form of electronic interference on the telephone at my office."

A second affidavit by Weinberg indicated that he and his cocounsel, Ms. Jordan, had freely discussed the case with certain named counsel (with addresses and telephone numbers) who were party to the information protected by the attorney-client privilege. He further alleged that any violation of the attorney-client privilege through electronic surveillance of any of the named counsel would violate his attorney-client relationship with Alter. The Stender affidavit corroborated the substance of Weinberg's first affidavit as to a "clicking sound," "what sounded like a receiver being picked up and put down," and the fact that no one was using another phone in the office at that time.

The second Alter affidavit[13] makes allegations of unlawful electronic surveillance conducted on his premises. Discussing two different telephone conversations, he mentions "successive, rapid clicking sounds." A friend of his was asked by the F.B.I. about an alleged telephone conversation between Alter and herself on a specific date. The F.B.I. arrived at a certain recreation site just as Alter and his companions were de-parting. The arrangements had been made by telephone. The timing of the F.B.I.'s arrival led him to conclude that they were not followed to the site, but that his "whereabouts were known because of the telephone arrangements." Alter made no specific allegations of electronic surveillance of his attorneys or his conversations with his attorneys.

We have recently confronted allegations by grand jury witnesses that their attorneys had been "subject to electronic surveillance by someone." In United States v. Fitch & Meisel, *supra* note 12, 472 F.2d 548, we upheld the district court's denial of their claim and apparent refusal to hold a hearing on the matter and noted that "[t]he vague and speculative affidavit of counsel required no more" than the Government's affidavit denying monitoring of any conversations of counsel talking with the witnesses (*id* at 549).[14]

*Fitch & Meisel* relies upon Cohen v. United States (9th Cir. 1967) 378 F.2d 751, which discusses the requisite specificity of a defendant's allegations of illegal monitoring of telephone calls to warrant an evidentiary hearing on a motion to suppress under Rule 41(e) of the Federal Rules of Criminal Procedure. *Cohen* announced a test that provides some guidance in the related area of grand jury witness allegations of unlawful electronic surveillance:

"The question is whether the allegations in the moving papers, including affidavits if any are filed, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. If the allegations are sufficient and factual issues are raised, a

---

13. The first Alter affidavit makes detailed allegations of physical surveillance and harassment by the F.B.I. over a period of one year to intimidate and coerce him into giving information.

14. The *Fitch & Meisel* panel expressly did not reach the question of "whether the limited discovery of electronic surveillance now allowed at the grand jury stage should extend to all conversations by the attorney of the witness." (472 F.2d at 549 n. 3). The apparent Government denial in *Fitch & Meisel* did not encompass conversations of the witnesses' counsel with persons other than the witnesses concerning matters related to their attorney-client relationship.

hearing is required." 378 F.2d at 761.[15]

### A.

We now add some flesh to the bones of the *Cohen* test. To raise a prima facie issue of electronic surveillance of counsel for a grand jury witness, the affidavit(s) or other evidence in support of the claim must reveal

(1) the specific facts which reasonably lead the affiant to believe that named counsel for the named witness has been subjected to electronic surveillance; ·

(2) the dates of such suspected surveillance;

(3) the outside dates of representation of the witness by the lawyer during the period of surveillance;

(4) the identity of the person(s), by name or description, together with their respective telephone numbers, with whom the lawyer (or his agents or employees) was communicating at the time the claimed surveillance took place; and

(5) facts showing some connection between possible electronic surveillance and the grand jury witness who asserts the claim or the grand jury proceeding in which the witness is involved.

When these elements appear by affidavit or other evidence the Government must affirm or deny illegal surveillance pursuant to 18 U.S.C. § 3504(a).[16] (*See* Beverly v. United States (5th Cir. 1972) 468 F.2d 732.)

The witness does not have to plead and prove his entire case to establish standing and to trigger the Government's responsibility to affirm or to deny. To obtain a hearing he need not identify the electronic intruder as the Government before he can compel a response. We do insist, however, that he make a prima facie showing that good cause exists to believe that the witness' counsel was subjected by someone to illegal surveillance in connection with the grand jury proceeding in which the witness is involved. We thus seek to create a sound balance among the competing demands of constitutional safeguards protecting the witness and the need for orderly grand jury processing. We do not overlook the intrinsic difficulty in identifying the owner of an invisible ear; nor do we discount the need to protect the Government from unwarranted burdens in responding to ill-founded suspicions of electronic surveillance. We agree with *Beverly* that the initial task of striking the balance between the conflicting and sensitive interests at stake properly lies in the district court. (Beverly v. United States, *supra* at 752.)

Although the affidavits Alter submitted to support his claim that his lawyer had been subjected to illegal surveillance were not vague and did embrace many of the elements of our test, the affidavits did not cover all of the bases that we require to be touched. If the grand jury pursues the investigation, he will have an opportunity on remand to correct the deficiencies.

### B.

In answer to Alter's own affidavits filed to support his claim that he had been subjected to illegal surveillance, the

---

15. Evidentiary hearings are not required in absence of solid allegations that raise a genuine issue concerning the fact of surveillance. *Cf.* Nardone v. United States (1939) 308 U.S. 388, 60 S.Ct. 266, 84 L.Ed. 307.

16. "In any trial, hearing, or other proceeding in or before any . . . grand jury . . . of the United States—

"(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act. . . ."

Although the Government here objects to the witness' standing on statutory or Fourth Amendment grounds, it has in its brief conceded standing on Sixth Amendment grounds. *Cf.* Beverly v. United States (5th Cir. 1972) 468 F.2d 732, 750–751; In re Tierney (5th Cir. 1972) 465 F.2d 806, 812.

Government filed a form affidavit signed by Special Attorney Dierker.[17] Alter challenged the legal sufficiency of the affidavit on three grounds: (1) the critical statements were conclusions based on multiple hearsay, (2) the agencies checked were too limited, and (3) the affidavit did not reveal the period covered by the investigation. Without specifically ruling on Alter's objections, or providing an opportunity to examine the affiant or to offer evidence, the court decided that the filing of the Dierker affidavit ended the inquiry. The decision was erroneous.

 Alter's affidavits were sufficiently concrete and specific to make a prima facie showing that on the occasions described someone was interfering with his telephone calls and that the F. B.I. was involved. The burden was then on the Government squarely to affirm or to deny those charges. (*Cf.* United States v. Fannon (7th Cir. 1970) 435 F. 2d 364.) The Dierker affidavit did neither.

Mr. Dierker speaks in conclusory terms. He supplies no information whatever about the identity of the person or persons with whom he communicated, the substance of his inquiries, or the substance of the replies. He states no facts from which the court could conclude that the six agencies he lists are the only governmental agencies that could have been involved in electronic surveillance. Nor does the affidavit reveal the dates of claimed surveillance to which the inquiries were addressed.[18] If any of the conclusions in the affidavit were later proved wrong, it would be virtually impossible to establish that the affidavit was perjured. (*Cf.* Bronston v. United States (1973) 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568.)

Upon remand, the Government may file a responsive factual, unambiguous, and unequivocal affidavit.[19] (*Cf.* Alderman v. United States (1969) 394 U.S. 165, 180–185, 89 S.Ct. 961, 22 L.Ed.2d 176.)

17. "ROBERT A. DIERKER being first duly sworn states:
 1. That I am an attorney with the United States Department of Justice, Internal Security Division, temporarily assigned to assist the United States Attorney for the Northern District of California, and I am authorized to represent the Government in grand jury investigations and judicial proceedings ancillary thereto;
 2. That I caused an official inquiry to be made with the appropriate Federal Government agencies to determine if there has been any electronic surveillance of the conversations of MARK LAWRENCE ALTER. The federal agencies to whom this inquiry was directed are:
 a. Federal Bureau of Investigation
 b. Bureau of Narcotics and Dangerous Drugs
 c. United States Secret Service
 d. Internal Revenue Service
 e. Bureau of Customs
 f. Bureau of Alcohol, Tobacco and Firearms
 g. United States Postal Service
 3. That based upon the results of the said inquiry I state that there has been no electronic surveillance occurring on premises known to have been owned, leased, or licensed by the said MARK LAWRENCE ALTER;
 4. I further state that based upon the said inquiry there has been no electronic surveillance of any kind of any conversations of the said MARK LAWRENCE ALTER at any locations;
 5. That I know the identity of all the sources of information upon which the questioning of the said MARK LAWRENCE ALTER is based and no questions asked are the result of electronic surveillance of the said MARK LAWRENCE ALTER.
 /s/
 ROBERT A. DIERKER
 Special Attorney
 United States Department of Justice"

18. Similar affidavits have been criticized by the Third and Fifth Circuits. In re Horn (3d Cir. 1972) 458 F.2d 468; Beverly v. United States, *supra*, 468 F.2d 732.

19. We do not attempt to anticipate the content of a new affidavit or to describe the procedure by which Alter will be given the meaningful opportunity to which he is entitled to test its legal and factual sufficiency. (*Cf.* In re Tierney, *supra*, 465 F.2d 806.)

## III.

 Alter argues that the immunity given under 18 U.S.C. § 6002 is unconstitutional as applied to him, as non-coextensive with his Fifth Amendment privilege against self-incrimination. The exception built into section 6002, he asserts, exposes him to potential prosecution for violating 18 U.S.C. § 1001 (willfully false statements to government department or agency) if the statement given to the F.B.I. a year before his grand jury appearance should prove to be false. As we construe section 6002, his fear is unfounded, and his constitutional attack fails.

Section 6002 provides that a grand jury witness given use and derivative use immunity cannot rely on his privilege against self-incrimination to refuse to testify,

> "but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, *except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.*" (Emphasis added.)

We accept the Government's construction of section 6002 as it applies to Alter:

> "[T]he phrase beginning with 'or otherwise' as underlined above, modifies the meaning of the preceding quoted phrase beginning with 'except.' The concluding phrase indicates that the compelled testimony may be used in prosecutions for giving false statements in response to the command to testify. But for the 'exception' quoted here, all testimony given in compliance with the command to testify cannot be used, as proscribed under the

preceding language of the immunity grant. . . . [T]he testimony which appellant might have given could not be used against him in any prosecution for any false statements made to anyone outside of the grand jury."

*Kastigar v. United States* (1972) 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 buttresses this conclusion. In holding that use and derivative use immunity under 18 U.S.C. §§ 6002 and 6003 is coextensive with the Fifth Amendment privilege against self-incrimination, the Court noted that the Fifth Amendment "protects against any disclosure that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Id.* at 445, 92 S.Ct. at 1656 (footnote omitted). Immunity "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Id.* at 453, 92 S.Ct. at 1661. Accordingly, in the event of a prosecution for making a false statement to the F.B.I., none of Government's proof could be based upon direct or indirect evidence gained by virtue of Alter's immunized grand jury testimony. The likelihood for abuse is minimized by "the heavy burden" *Kastigar* places on the Government to prove that "all of the evidence it proposes to use was derived from legitimate independent sources." *Id.* at 461–462, 92 S. Ct. at 1665 (footnote omitted).

## IV.

 On several occasions appellant requested that the court give nine specific instructions to the grand jury on its role and powers and on the rights of witnesses.[20] He also asked for and was initially denied a copy of the charge given to the grand jury. He was even-

---

20. These instructions focused on:
 (a) the power and authority of the grand jury to question witnesses and hear evidence as emanating from the court;
 (b) the nature and extent of this power;

 (c) the role of the United States Attorney as an assistant to the grand jury;
 (d) a witness' right to assert the Fifth Amendment prior to the grant of immunity, the lack of counsel in the grand jury room, and the legal effect of an immunity grant.

tually furnished with a transcript of the "supplemental instructions" and allowed to read the general charge to the grand jury.[21] Alter's complaint about instructions to the grand jury dwindles to a protest about delay in responding to his requests for the court's general and special grand jury instructions. The record supplies no basis for us to infer that he was prejudiced in presenting his contempt defense either by delay in knowing the original charges to the grand jury or by the refusal to give his requested instructions to the grand jury. Under these circumstances, we decline to reach the merits of his grand jury instruction arguments.

The order is vacated, and the cause is remanded for further proceedings consistent with the views herein expressed.

---

21. Alter was entitled to know the content of the court's charges to the grand jury. The proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not. *E. g.*, U. S. Judicial Conference Committee on the Operation of the Jury System, Handbook for Federal Grand Jurors 10 (1971).