**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael TOBIAS, Defendant–Appellant.**

No. 85–5255.

United States Court of Appeals, Ninth Circuit.

Argued Aug. 5, 1986.

Submitted Dec. 17, 1987.

Decided Jan. 6, 1988.

Joan P. Weber, San Diego, Cal., for plaintiff-appellee.

Mark F. Adams, San Diego, Cal., for defendant-appellant.

Before ANDERSON, PREGERSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Michael Tobias was convicted of espionage and theft of government property. Tobias appeals, claiming that the trial court erred by denying his motion for judgment of acquittal, refusing to order the production of certain grand jury records, and denying his motion for additional disclosures regarding electronic surveillance. We affirm.

**I. FACTS**

On August 12, 1984, Secret Service Special Agent Ronald Luzania received a telephone call from an unidentified caller. The

caller claimed to have cards with holes punched in them, stamped "TOP SECRET, CRYPTO", which he believed belonged to the Navy. He claimed that a foreign party had expressed interest in the cards and had offered to pay $100,000 for them. The caller stated that on account of his sense of patriotism he intended not to go through with the sale to the foreign authorities and instead wanted to sell the cards to the government.

The caller first offered to exchange the cards in his possession for money through a dead drop arrangement at a specified location. This offer was not accepted. Later the caller told Agent Luzania that if he went to a certain school he would find an envelope containing additional information under a dumpster. At the location, Agent Luzania discovered a plain white envelope containing a cream-colored perforated crypto card marked "TOP SECRET" with the top portion torn off. Agent Luzania passed the card on to the FBI.

The caller left another message directing Agent Luzania to call a certain telephone number. Agent Luzania called and stated that he had retrieved the envelope, and expressed interest in receiving more information. The caller offered to provide additional cards through a dead drop arrangement and proposed a payment drop for $1,000 in return for the remaining cards. The FBI traced the phone number given to a telephone booth, and there the FBI agents apprehended two individuals—later identified as appellant Michael Tobias and his coconspirator Francis Xavier Pizzo.

The investigation conducted by the FBI and the Naval Investigation Service disclosed that radioman Anthony Anderson of the U.S.S. PEORIA had signed crypto-graphic card destruction logs on July 29, 1984 and, after seeking the authorization of Chief Radioman Ellis Flanagan, had left Tobias solely in charge of destroying the cards. Apparently, Tobias did not carry out the destruction of those cards. Twelve crypto cards were in use that day. Along with the torn card given to Agent Luzania, the FBI eventually recovered nine of the cards from Dale Irene, a friend of Tobias. Two cards have not been accounted for.

Michael Tobias was charged in seven counts of a nine-count indictment with violating or conspiring to violate the laws prohibiting the theft of government property, the disclosure of classified information, and the retention of defense information. 18 U.S.C. §§ 371, 641, 793, 798. In August 1985, a jury returned a verdict of guilty as to each of the seven counts in the indictment naming Tobias. The judge sentenced Tobias to twenty years in prison, to be followed by five years of probation.

On November 18, 1985, Tobias filed a notice of appeal from the judgment entered on the same date. He claims that the trial court erred (1) in denying his motion for judgment of acquittal on the counts involving section 641, (2) in refusing to order production of certain ministerial records of the grand jury, and (3) in denying his motions for search and disclosure of electronic surveillance.

## II. DISCUSSION

### A. Section 641

Tobias moved for a judgment of acquittal on four counts of his indictment on the ground that 18 U.S.C. § 641, properly construed, does not apply to his actions.[1] Section 641 is the general provision making

---

1. 18 U.S.C.A. § 641 (1976 & Supp.1987) reads:
   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
   Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—
   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.
   The word "value" means face, part, or market value, or cost price, either wholesale or retail, whichever is greater.

theft or conversion of government property unlawful. Tobias argues that Congress did not intend the general statute to apply to offenses relating to classified information. He cites an opinion of Circuit Judge Harrison L. Winter for the proposition that Congress has established an elaborate statutory scheme for making the misuse of classified information unlawful and that section 641 is inapplicable to acts falling within the purview of that scheme. *See United States v. Truong Dinh Hung*, 629 F.2d 908, 926 & n. 21 (4th Cir.1980) (Winter, J., concurring as to this issue).

Our circuit has adopted an even broader limitation on the scope of section 641. In *Chappell v. United States*, 270 F.2d 274 (9th Cir.1959), we held, after an extensive discussion of the legislative history, that section 641 should not be read to apply to intangible goods.[2] This interpretation has the advantage of avoiding the first amendment problems which might be caused by applying the terms of section 641 to intangible goods—like classified information. *See Truong Dinh Hung*, 629 F.2d at 924–28 (Winter, J., concurring as to this issue). Thus, while our rationale is different, we, like Judge Winter, construe section 641 as being generally inapplicable to classified information.

We note that two circuits have reached conclusions contrary to ours on this point. *See United States v. Jeter*, 775 F.2d 670, 679–82 (6th Cir.1985), *cert. denied*, 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986); *United States v. Girard*, 601 F.2d 69, 70–72 (2d Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). However, we are not persuaded that we should reconsider *Chappell.* More important, we do not believe that the "intangible goods" or "classified information" exception to section 641 is applicable to the property involved in the case before us.

At trial, prosecution witness Stephen Carter, a civilian employee of the National Security Agency, testified on the function and importance of cryptographic cards. Cryptographic cards and a cryptographic machine are the two components of the cryptographic system the Navy uses to code and decode top secret messages transmitted to ships at sea. The cards constitute a device for setting part of the "maze", the instructions by which messages are encoded. Every ship has the same cryptographic machines and uses the same set of cards. At the end of each day, that day's set of cards is destroyed and a new set is inserted into the machine, changing the encoding and decoding instructions.

For a foreign power to decode the messages sent to American ships, it would have to have both a cryptographic machine and the cards used on the day the message was sent. Mr. Carter testified that the National Security Agency has good evidence that hostile powers possess an American cryptographic machine. Thus, the security of the messages sent to American ships depends on the security of the cryptographic cards.[3] Even though any particular set of cards is used for only one day, old cards are not without value. If a hostile power had recorded transmissions of an earlier date, the cards from that date would enable it to decipher those transmissions (assuming that the nation already had the cryptographic machine).

---

**2.** A footnote in a recent case questioned the continued validity of *Chappell. United States v. Schwartz*, 785 F.2d 673, 681 n. 4 (9th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986). However, *Schwartz* dealt with the interpretation of a different statute, 18 U.S.C. § 1954. The opinion gave a broader interpretation to the phrase "thing of value" in section 1954 than *Chappell* had given to the same phrase in section 641. However, the decision in *Schwartz* was based in part on the fact that section 1954 had a legislative history distinctly different from that of section 641. *Id.* at 680–81.

**3.** Elaborate security procedures surround the destruction of cards after use. Two persons must each verify the number of each card against numbers in a destruction log. Both persons individually initial the log upon verification, and both persons witness the shredding of the cards. The procedures did not work in this case because one of the two persons on "destruction duty", Anthony Anderson, initialed the log and left early without actually witnessing the cards' destruction.

In summary, the value of the cryptographic cards comes from their use as a *device* for the encoding and decoding of classified information. The cards do not themselves contain any information.[4] They are tangible property, and thus fall within the scope of section 641.

### B. *Production of Grand Jury Records*

Tobias filed a motion for disclosure of certain records of the grand jury which returned the indictment. Tobias requested those documents allegedly in order to determine whether the grand jury was lawfully constituted and supervised, and whether a quorum of grand jurors considered the evidence and voted to indict.

The trial court denied Tobias' motion, ruling as follows:

[I]n light of your papers and the secrecy of the grand jury, I think the government is going to give you the testimony of the witnesses who testified. The other things you will have to—the government does not have to give you the items listed in your motions because you haven't made a sufficient showing. You may review that at any time.

Tobias claims that the trial court erred in thus denying his motion. He contends that the court should have reviewed *in camera* the records sought and then ordered the government to produce them. Tobias relies on *In re Special Grand Jury (for Anchorage, Alaska)*, 674 F.2d 778 (9th Cir. 1982), which held that the public has the right of access to certain grand jury ministerial records.

Whatever the merit of Tobias' claim under *Special Grand Jury*, the harmless error doctrine renders it unreviewable at this time. Tobias' discovery motion purported to seek inadequacies in the grand jury's charging process. However, under a doctrine recently announced by the Supreme Court, any deficiencies in that process were rendered harmless by the subsequent petit jury conviction. *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986). "*Mechanik* holds that any ... prejudice [resulting from an erroneous charging decision by the grand jury] is wiped out by the petit jury's verdict." *United States v. Benjamin*, 812 F.2d 548, 553 (9th Cir.1987).

We believe that the error alleged by Tobias "[is] sufficiently aimed at the grand jury's charging process that [it] fall[s] within the ambit of *Mechanik*." *Id.* The general inadequacies into which Tobias wished to probe through discovery affect more the grand jury's charging process than the fundamental fairness of the criminal proceedings. *Cf. United States v. Taylor*, 798 F.2d 1337, 1339–40 (10th Cir.1986). In order to challenge the denial of his motion, consequently, Tobias should have sought interlocutory review rather than appealing after his conviction. *See United States v. Benjamin, supra.*

### C. *Disclosure Regarding Electronic Surveillance*

Tobias contends that the district court abused its discretion by denying his motion for disclosure of illegal surveillance. 18 U.S.C. § 3504 (1982) states that "upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act ... the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act." In response to Tobias' claim, the government must "squarely" affirm or deny illegal surveillance by means of "a responsive factual, unambiguous and unequivocal affidavit." *United States v. Alter*, 482 F.2d 1016, 1027 (9th Cir.1973).[5] "However, because responding to ill-founded claims of electronic surveillance would place an awe-

---

**4.** Appellant accepts this characterization of the cards. *See* Appellant's Reply Brief 1–2.

**5.** The government argues that *Alter* requires Tobias to "make a *prima facie* showing that good cause exists to believe that [he] was subjected by someone to illegal surveillance...." *Alter*, 482 F.2d at 1026. However, as we explained in

*United States v. Vielguth*, 502 F.2d 1257 (9th Cir.1974), the claimant must establish a *prima facie* case under *Alter* only if he alleges "unlawful surveillance of conversations *in which he did not participate.*" *Id.* at 1259 (emphasis added). Here, Tobias alleges unlawful surveillance of his own conversations.

some burden on the government, a claim of government electronic surveillance of a party must be sufficiently concrete and specific before the government's affirmance or denial must meet the requirements of *Alter*". *United States v. See*, 505 F.2d 845, 856 (9th Cir.1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975).

On November 15, 1984, Tobias filed a motion for disclosure of electronic or other surveillance. The government responded to the motion on January 15, 1985, with the statement that "there has been no electronic surveillance conducted by any government agencies in this case." On February 25, 1985, Assistant United States Attorney Joan Weber, assigned to the Tobias investigation, filed an affidavit stating that she had ordered a search of the FBI, the Naval Investigative Service, and the Secret Service which revealed that no electronic surveillance of any kind was conducted by any of these agencies at any time during the Tobias investigation.

On that same day, Tobias filed an affidavit in support of his claim of illegal surveillance. In the affidavit, he stated that on August 12, 1985, FBI agents DeWitt and Hamilton approached him at a phone booth in front of his apartment, asked him the name and telephone number of the person he had been speaking to on the phone, and then called the number he supplied to verify that Tobias had been speaking to that individual. Tobias asserted that he then heard the agent communicate "official information to someone on the telephone line without dialing and by simply remaining on the line".

On April 29, 1985, FBI agent Debra DeWitt filed an affidavit specifically denying these allegations. DeWitt's affidavit stated that she and agent Hamilton never placed a call to the individual Tobias said he was speaking to on the phone. She claimed that the phone call which the agents placed was to their office. DeWitt stated that "the telephone booths at that location have never been electronically surveilled for the purposes of this investigation."

 Tobias's allegations were sufficiently "concrete and specific", *United States v. Alter*, 482 F.2d at 1027, to require a response by the government. However, the DeWitt affidavit supplied the requisite government denial. The affidavit was sworn by a responsible government official with personal knowledge of the facts at issue. As in *United States v. See*, "[t]he government's response to the claim was more than adequate." 505 F.2d at 856. We, consequently, hold that the district court did not abuse its discretion in denying Tobias' motion for disclosure of illegal surveillance.

For the reasons given above, the judgment of the district court is

AFFIRMED.