In re GRAND JURY PROCEEDINGS
WITNESS Albert L. BARDIER.

In re GRAND JURY PROCEEDINGS
WITNESS Joan Norris WHEELER.

Nos. CV–LV–79–218, CV–LV–79–217.

United States District Court,
D. Nevada.

March 6, 1980.

---

**1206**

Geoffrey A. Anderson, Las Vegas Strike Force, Las Vegas, Nev., for petitioner.

Stanley Greenberg, Los Angeles, Cal., Stephen Stein, Las Vegas, Nev., for respondent.

### DECISION

CLAIBORNE, District Judge.

The within matter is before the Court in these two cases for decision on the Government's application for contempt order as to both Special Grand Jury witnesses, Albert Bardier and Joan Wheeler. The Special Grand Jury is in the process of investigating alleged violations of 18 U.S.C. §§ 371 and 1962 and 26 U.S.C. §§ 7201 and 7206(1) [racketeering; conspiracy; income tax evasion; false and fraudulent return], the named targets of which are Joseph V. Agosto and Tropicana Hotel & Casino and its affiliate corporations. The witnesses in question, Joan Norris Wheeler and Albert Bardier, are, respectively, the administrative assistant to Agosto and the accountant to Agosto in connection with Agosto's activities as President of Productions & Leasing, Inc.

In August of 1979, the Government served grand jury subpoenas duces tecum upon the witnesses seeking records and documents under their custody and control. The Wheeler subpoena seeks production of any and all records of Lands West Development Co., Inc., Productions & Leasing Ltd., Inc., Las Vegas Follies, Inc., and Aden Oil Leasing Co., Inc. for the period 1/1/73–12/31/78 to include but not be limited to the following:

1. Bank statements, deposit tickets, cancelled checks, debit and credit memorandums regarding any account maintained for or on behalf of the above-named companies.

2. Sales journals, cash register tapes, sales receipts, charge account receipts or any other record reflecting sales made by the above-named companies.

3. Purchase journals, purchase invoices, or any other records reflecting purchases made by the above-named companies.

4. Cash disbursement journals, cash receipt journals, payroll journal, general journal and general ledger and all subsidiary ledgers including accounts receivable of the above-named companies.

5. Records maintained for the purpose of keeping a perpetual inventory and records generated in the taking of a physical inventory of the above-named companies.

6. Profit and loss statements and balance sheets prepared by or on behalf of the above-named companies.

7. Corporate minute book and stock transfer records of the above-named companies.

8. Stock purchase and sale records made by anyone for or on behalf of the above-named companies.

9. Records (including customer copies) of certificates of deposit, money market certificates, bank money orders and cashier's checks purchased or redeemed for or on behalf of the above-named companies.

The Bardier subpoena seeks production of "any and all records relating to work performed for or on behalf of Joseph V. Agosto, Mary M. Agosto, Mary Agosto Trust, Pietro Pianetti Trust, Productions & Leasing, Ltd., Lands West Development Company, Inc., Sumo Corp., Tropicana Hotel Productions, Associates of Tropicana, Aden Oil Leasing Company, Inc., Las Vegas Follies, Inc., Cash 10 of Alaska, Agosto's Nisqually Plaza, Inc., and Margaret White for the period 1/1/73–12/31/78 to include but not be limited to the following:

1. Retained copies of federal tax returns (Forms 1040, 1041, 0165, 1120, 1120S and 941's).

2. Copies of Requests of Extension of Time to File.

3. Work papers (i. e., bank reconciliations, working trial balances, etc.).

4. Correspondence file, billing records, notes memoranda, etc.

5. Bank statements, cancelled checks, deposit tickets & debit and credit memorandums.

6. Cash receipts and disbursements journals, payroll journals, general journals, general ledgers and all subsidiary ledgers.

7. Records of funds loaned and borrowed.

8. Financial statements (profit & loss, balance sheets, etc.).

9. Corporate minute books, stock transfer records, partnership agreements and dissolutions.

10. Audit reports.

11. Records of capital and personal expenditures.

12. Inventory Records.

13. Forms 1099 and W–2.

14. Savings account passbooks.

15. Stock brokerage statements.

16. Purchaser's receipts for all cashiers checks purchased.

17. All other records not specifically enumerated above which reflect or are related to the financial activities of those individuals or entities listed.

The witnesses appeared before the Special Grand Jury in September of 1979 and, at that time, both witnesses refused to testify, asserting the First, Fourth, Fifth and Sixth Amendments to the United States Constitution and 18 U.S.C. § 3504 as the legal basis for their refusal. Accordingly, the Government sought and obtained an application for a contempt order. On November 19, 1979, both witnesses, by and through their attorneys of record, Stanley Greenberg and Stephen Stein, filed a lengthy opposition, expounding upon the aforementioned legal bases for their refusal to testify. Following the Court's Order of February 5, 1980 denying the Government's motion to disqualify Stein and Greenberg, the applications for contempt order are ripe for decision.

### 1. 18 U.S.C. § 3504

The witnesses' first argument is that the Government's refusal to respond officially to the witnesses' claim of unlawful electronic surveillance is just cause for the subsequent refusal to testify before the grand jury. By way of this argument, the following further facts appear:

On August 20, 1979, subsequent to the service of the within subpoenas upon the witnesses, Greenberg submitted his affidavit to the Government in which he claimed that certain evidence demanded by the two subpoenas was inadmissible because the Government's knowledge of the materials and the request therefor, Greenberg alleged, was the primary product of unlawful electronic surveillance or obtained by the exploitation thereof. Specifically, Greenberg claimed in his affidavit: 1) The "Kansas City and Las Vegas affidavits"[1] do not appear to contain evidence of violations of tax laws; 2) Greenberg had conversations with two officers of the Los Angeles Police Department's Organized Crime Intelligence Division, wherein one of the Officers asked Greenberg about his recent foreign travels; Greenberg had not previously mentioned any such travels to said Officers; 3) Another of the officers stated, in effect, that he had heard that a recent income tax return filed by Agosto, declaring therein that $300,000 was due and owing the Government, was "chump change"; 4) Over the past year and a half, Greenberg has heard clicking noises on his telephone, breathing and throat-clearing from third persons during the course of telephone conversations, and has discovered a small piece of plastic attached to the outside covering of his phone—albeit no telephone repairman to his knowledge has made any repairs during any relevant time periods; 5) During his travels to Las Vegas to see Agosto in connection with representation of Agosto in civil matters, Greenberg has seen men observing him and taking notes on at least five occasions; 6) Agosto reported two burglaries in December of 1978 and January of 1979; 7) In May of 1979, Greenberg received an Inventory indicating that telephone conversations in which he was involved had been intercepted, and this Court subsequently ordered disclosure of the contents of those conversa-

1. The affidavits which gave rise to the execution of five search warrants on February 14, 1979 of the premises of Agosto, Productions & Leasing, Inc., and the Tropicana Hotel and Casino. (Cf. Misc. Civ. 722).

tions. They have been "partially"[2] disclosed.

In response, Department of Justice Special Attorney Anderson wrote an informal letter to Greenberg dated September 11, 1979, in which he (Anderson) denied the alleged illegalities rather summarily. Subsequent to the lengthy opposition, Anderson submitted his affidavit in response to Greenberg's affidavit on December 6, 1979, wherein he stated:

. . . [U]pon receipt of the movants response herein, I inquired of the two supervising case agents involved in the FBI and IRS investigations, respectively, of Joseph V. Agosto and the Tropicana Hotel and Casino, whether any illegal or warrantless electronic surveillance had been conducted of Albert L. Bardier, Joan Norris Wheeler, Stephen Stein or Stanley I. Greenberg, and they advised, after reviewing their files in Las Vegas, Nevada, that none had been by their agency nor had any been reported to their agency.

I have no information that any state law enforcement authority in California has conducted any lawful or unlawful electronic surveillance of Mr. Bardier, Mrs. Wheeler or their attorneys, Messrs. Stein and Greenberg.

I am advised by the FBI that certain conversations of Mr. Greenberg and Mr. Stein were intercepted during the course of monitoring by FBI agents pursuant to court-authorized electronic interception authorized in Orders CCA 22, 22x, 23 and 23x. Copies of the transcripts of said interceptions have been provided to Messrs. Stein and Greenberg as required by this Court in its Order of August 1, 1979; copies have also been provided to the Court. No information obtained from those conversations was utilized to issue the supboena in question nor will

any such information be used, at this time, in interrogating these witnesses before the grand jury.

Both parties rely upon the Ninth Circuit case of *United States v. Alter*, 482 F.2d 1016 (9th Cir. 1973) for resolution of this dispute. In fact, *Alter* is so directly on point as to require extended discussion. In that case, a grand jury witness refused to answer questions based, inter alia, upon claimed illegal electronic surveillance of himself and his counsel. The Court held: 1) A vague and speculative affidavit of counsel requires no more than the Government's affidavit denying monitoring of any conversations of counsel talking with the witnesses. 482 F.2d at 1025, citing *United States v. Fitch & Meisel*, 472 F.2d 548, 549 (9th Cir. 1973). 2) To raise a prima facie issue of electronic surveillance of counsel for a grand jury witness, the affidavit(s) or other evidence in support of the claim must reveal (a) the specific facts which reasonably lead the affiant to believe that named counsel for the named witness has been subjected to electronic surveillance; (b) the dates of such suspected surveillance; (c) the outside dates of representation of the witness by the lawyer during the period of surveillance; (d) the identity of the person(s), by name or description together with their respective telephone numbers, with whom the lawyer (or his agents or employees) was communicating at the time the claimed surveillance took place; and (e) facts showing some connection between possible electronic surveillance and the grand jury witness who asserts the claim or the grand jury proceeding in which the witness is involved. 482 F.2d at 1026. 3) An attorney has standing to claim the unlawful surveillance of his clients, in conformity with the above test. 482 F.2d at 1026, n. 16.[3] 4) Where the attorney's affidavits are sufficiently con-

---

**2.** By "partially", it is meant that the Government has disclosed all of the conversations which it alleges were intercepted, but has not disclosed an affidavit or other evidence to verify that allegation.

**3.** Accord: *United States v. Vielguth*, 9th Cir., 502 F.2d 1257, 1259–1260. The Government's

reliance upon *United States v. Hearst*, 412 F.Supp. 863, 869 (N.D.Cal.1975) to the contrary is misplaced since the Defendant therein did not seek intercepted conversations of her attorney, thereby implicating the attorney's standing to raise his client's Sixth Amendment rights, as here.

crete and specific to make a prima facie showing that on the occasions described someone was interfering with his telephone calls, the burden falls on the Government squarely to affirm or to deny those charges; and a Government affidavit which is based upon hearsay and multiple hearsay, speaks in conclusory terms, states no facts from which the court can conclude that the averring government agents represent the only governmental agencies that could have been involved in electronic surveillance, and/or does not reveal the dates of claimed surveillance to which the inquiries were addressed, is insufficient as a matter of law to discharge the Government's responsibilities under 18 U.S.C. § 3504(a). 482 F.2d at 1027.

Applying the principles to the case at bar, it is clear that Greenberg's affidavit is sufficiently specific within the meaning of the *Alter* test,[4] except for one thing: the *sine qua non* of a sufficient affidavit under the *Alter* test is the prima facie demonstration of *illegal* electronic interceptions. See 482 F.2d at 1026. Greenberg certainly demonstrates that he was the subject of electronic surveillance, but it is also known that he was the subject of *legal* (i. e., Court-ordered) electronic surveillance, the transcripts of which have been disclosed to him pursuant to Court Order. If Greenberg had been able to show specific facts that he had been subjected to electronic surveillance, and the transcripts provided him of the Court-ordered surveillance could not explain away or justify these facts, then the affidavit would have been sufficient. However, this is not the case; all facts alleged by him, insofar as the Court can determine, are consistent with the Court-ordered electronic interceptions of him and his clients.

The Government affidavit tendered on December 6, 1979 is wholly inadequate to meet an adequate affidavit; incredibly, the Anderson affidavit virtually parallels the Government affidavit held to be inadequate in *Alter*. Cf. 482 F.2d at 1027, n. 17. However, since the Greenberg affidavit of August 20, 1979 was "inadequate," for reasons stated above, the Anderson affidavit's multiple hearsay and conclusory allegations sufficed to discharge the Government's obligation under 18 U.S.C. § 3504(a) as to the Greenberg affidavit.

 This does not mean, however, that the witnesses can be held in contempt. The Greenberg affidavit, however "inadequate", was adequate enough to require at least a Government affidavit. The Ninth Circuit drew this distinction in *United States v. Vielguth*, 502 F.2d 1257: Where a claim of electronic surveillance is made, however conclusory, by persons *who were a party to the conversation*, the Government must respond by way of affidavit; but where the claim is made by persons who were not parties to the conversation, and the claim is not otherwise sufficient, the Government need not respond. 502 F.2d at 1258–1259 (emphasis added). Greenberg's claims are made with respect to conversations to which he was a party; therefore, the Government was required to respond by affidavit. The Government did not so respond until nearly three months after the witnesses refused to testify; therefore, their refusal to testify at that time was justified [5] (cf. *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972)), although a subsequent refusal based upon this record would not be.

---

4. Although not specifically enumerated in this opinion, Greenberg adequately states the dates or approximate dates of such suspected surveillance, *the outside dates of representation of the* witnesses during the period of surveillance, and the identity of the persons, by name or description, together with their respective telephone numbers, with whom he was communicating at the time the claimed surveillance took place. The connection between the surveillance of the Agosto-Greenberg telephone calls and the within proceedings has already been stated.

5. I am not aware of any authority for the proposition that the Government can discharge its obligations under 18 U.S.C. § 3504(a) by way of an informal letter. I have to presume that when the Ninth Circuit speaks of "affidavits" in *Alter* and *Vielguth* it means a document which, if proven to be false, could form the basis of a charge of perjury. Cf. *Alter, supra* at 1027. Such would not be the case with an informal letter.

## 2. Issuance of the subpoenas for a lawful purpose

Next, the witness Wheeler argues that the grand jury subpoenas have not been issued for a lawful purpose. This argument runs as follows: by way of these subpoenas, the Government seeks documents which it already obtained by reason of the February 14, 1979 seizure in connection with the aforementioned search warrants and remitted copies thereof back to the witness. Specifically, the documents referred to are documents of Productions & Leasing, Inc., items # 5, 10, 12, 14, 15, 17, 20, 21, 21A, 24, 29, 31, 34, 36, 37, 38, 42, 43, 45, 46, 47 and 49 as listed on the search return inventory of 2/15/80. The seized items, or some of them allegedly exceeded the scope of the warrant. Thus, the Government seeks to subpoena records which are already in its possession, in order to obviate the illegality surrounding their present possession of the same.[6]

■ There is a relatively simple answer to this somewhat complex argument. In order to require production of documents prior to· trial under F.R.Cr.P. Rule 17, the moving party (Government) must show, inter alia, that the documents sought are not otherwise procurable reasonably in advance of trial by exercise of due diligence. *United States v. Nixon*, 418 U.S. 683, 699, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974). If the moving party cannot show this, then the subpoena is burdensome and oppressive to that extent and must be quashed accordingly, pursuant to F.R.Cr.P. Rule 17(c). Cf. *Matter of Special April 1977 Grand Jury*, 581 F.2d 589, 594 (7th Cir. 1978). This rule traces back to Judge Weinfield's formulation in *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y.1952) and has as its primary basis a statutory interpretation of "good cause" and "reasonableness" within the meaning of F.R.Cr.P. Rule 17(c) (*Id.*), without regard to any prior "illegal" search and/or seizure within the meaning of the Fourth Amendment to the United States Constitution.

■ The Government presents no evidence to the effect that it does not seek documents already in its possession by reason of the 2/14/79 search; accordingly, the Wheeler subpoena must be quashed to that extent.

Bardier also argues that the subpoenas infringe upon his First Amendment freedoms as to the sought-after records of Margaret White and Mary Agosto; he argues that the only apparent basis for subpoenaing the records of those two witnesses is their association with target Joseph V. Agosto on a social basis. He argues further that the burden is on the Government in this instance to prove that its interests in seeking the records are so compelling as to subordinate the conflicting First Amendment freedoms (cf. *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972)), and the Government cannot and has not met this burden.

■ It is not immediately clear to this Court how Bardier's First Amendment rights are infringed by a supposed impingement upon the First Amendment freedom of association as between Margaret White, Mary Agosto, and Joseph V. Agosto. The Court recognizes the fact that the rules of "standing" under Art. III of the United States Constitution are somewhat more flexible in the arena of First Amendment freedoms than in other areas of the law. Cf. *Gibson v. Florida Legislative Investigative Committee*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct.

---

**6.** This argument was originally presented, insofar as the Court can determine, as a Fourth Amendment argument under the case of *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. At oral argument, counsel for the witnesses clarified the same and it now appears to be a Fifth Amendment "due process" claim. The reason for this seems clear enough: the case of *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1973) virtually limited the *Silverthorne* holding to its facts (cf. 94 S.Ct. at 622, n. 8), and the *Silverthorne* facts—involving a pre-existing indictment and a pre-existing judicial determination of a Fourth Amendment violation at the time of issuance of the subpoena—are inapposite to the case at bar.

2440, 49 L.Ed.2d 310 (1976). Nonetheless, in order to have standing to assert First Amendment rights, an individual must present more than· allegations of a subjective chill; there must be a claim of specific present objective harm or a threat of specific future harm to the moving party, such as there can be no doubt concerning the party's personal stake in the outcome of the controversy. The Court does not obtain jurisdiction over a First Amendment claim where the party before the Court seeks to raise the hypothetical rights of others. *Bigelow v. Virginia*, 421 U.S. 809, 810–817, 95 S.Ct. 2222, 2230, 44 L.Ed.2d 600 (1975), and cases cited therein.

 The witness has not met this standard. Clearly, it is not a crime in this country merely to be associated with the perpetrator of a crime—if that is the situation at bar. Cf. *United States v. Williams*, 341 U.S. 58, 71 S.Ct. 595, 599, 95 L.Ed. 747 (1951); *United States v. Camacho*, 528 F.2d 464, 468 (9th Cir.), *cert. denied*, 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). And otherwise, it is not clear how Bardier could claim a personal stake in the outcome of this controversy;[7] accordingly, the Court must conclude that he is merely asserting the hypothetical First Amendment rights of others, and the Court has no jurisdiction to decide the merits of the issue.

*3. Fifth Amendment· Privilege (Bardier)*

Bardier's refusal to comply with the within grand jury subpoena is predicated in part upon an assertion of his Fifth Amendment rights. He argues that since this investigation encompasses alleged violation(s) of Title 26, and since he is the accountant to Agosto, he (Bardier) is a *de facto* target; the subpoenaed documents under his custody and control—the ones prepared by him, the ones turned over to him by the taxpayer Agosto and the ones relating to Bardier's

business—are potentially incriminating in that they contain statements which would evidence criminality either on the part of the taxpayer or on the part of the tax return preparer; and that compliance with the subpoena would cause him to concede, restate, or reaffirm the existence of said documents, which constitutes a "communicative act" for Fifth Amendment·purposes.

██ With respect to the documents in Bardier's possession not prepared by himself, the Supreme Court opinion in *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) is dispositive. In *Fisher* the taxpayers, who were under investigation for possible civil or criminal liability under ·the federal income tax laws, obtained from their respective accountants certain documents relating to the · accountants' preparation of their tax returns, and subsequently transferred the documents to their respective attorneys to assist the taxpayers in connection with the investigations. Subsequently, the Internal Revenue. Service served summons on the attorneys directing them to produce the documents, but they refused to comply, predicated in part upon the Fifth Amendment to the United States Constitution. The Supreme Court held that the documents in the hands of the taxpayers' attorneys were not immune from production by reason of the Fifth Amendment, stating:

A subpoena served on a taxpayer requiring him to produce an accountant's workpapers in his possession without doubt involves substantial compulsion. But it does not compel oral testimony; nor would it ordinarily compel the taxpayer to restate, repeat, or affirm the truth of the contents of documents sought. Therefore, the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer, for the privilege protects

---

7. To the extent that Bardier might try and make some connection between other persons' freedoms of association and the confidentiality of communications between himself and his clients (such as, presumably, Margaret White, Mary Agosto, and Joseph Agosto) pursuant to the accountant-client privilege, the Court would note that while such an evidentiary privilege exists in the State of Nevada (cf. NRS 49.125 et seq.), it does not exist in Federal Courts in an action such as this. *Couch v. United States*, 409 U.S. 322, 335, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973), and cases cited therein.

only against being incriminated by his own compelled testimonial communications. [cites omitted]

. . . . .

. . . In light of the records now before us, we are confident that however incriminating the contents of the accountant's workpapers might be, the act of producing them—the only thing which the taxpayer is compelled to do—would not itself involve testimonial self-incrimination.

425 U.S. at 409, 410–411, 96 S.Ct. at 1580, 1581. The converse situation is before the Court—i. e., the taxpayers' documents in the hands of the subpoenaed accountant—but the principle is the same: the act of producing another person's papers by obeying a grand jury subpoena does not involve testimonial self-incrimination. See also *Couch v. United States*, 409 U.S. 322, 329, 93 S.Ct. 611, 616, 34 L.Ed.2d 548 (1973).

■ But what of the documents in Bardier's possession prepared by himself, a nontarget, with respect to the target Agosto's tax returns? Language in the *Fisher* case would tend to suggest that the Fifth Amendment privilege would not be available to Bardier in this situation as well. The Supreme Court stated in *Fisher*:

. . . [A]s far as this record demonstrates, the preparation of all of the [accountant's work] papers sought in these cases was wholly voluntary, and they cannot be said to contain compelled testimonial evidence, either of the taxpayers *or of anyone else.*

425 U.S. at 409–410, 96 S.Ct. at 1580 (emphasis added). Expounding upon this, the Court went on to state in Footnote 11:

The fact that the documents may have been written by the person asserting the privilege is insufficient to trigger the privilege [cites]. And, unless the Government has compelled the subpoenaed person to write the document [cites], the fact that it was written by him is not controlling with respect to the Fifth Amendment issue . . . In the case of a documentary subpoena the only thing compelled is the act of producing the

document and the compelled act is the same as the one performed when a chattel or document not authored by the producer is demanded. McCormick § 128, p. 261.

425 U.S. at 410, 96 S.Ct. at 1580. Still later in the *Fisher* opinion, the Supreme Court stated:

It is doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment. The papers belong to the accountant, were prepared by him, and are the kind usually prepared by an accountant working on the tax returns of his client. Surely the Government is in no way relying on the "truth-telling" of the taxpayer to prove the existence of or his access to the documents. 8 Wigmore § 2264, p. 380. The existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers. Under these circumstances by enforcement of the summons "no constitutional rights are touched. The question is not of testimony but of surrender." [cite omitted]

425 U.S. at 411, 96 S.Ct. at 1581. See also 425 U.S. at 413, 96 S.Ct. at 1582. And, still later in the *Fisher* opinion, the Supreme Court stated:

Moreover, assuming that these aspects of producing the accountant's papers have some minimal testimonial significance, surely it is not illegal to seek accounting help in connection with one's tax return or for the accountant to prepare workpapers and deliver them to the taxpayer. At this juncture, we are quite unprepared to hold that *either the fact of existence of the papers* or of their possession by the taxpayer poses any realistic threat of incrimination to the taxpayer.

425 U.S. at 412, 96 S.Ct. at 1581 (emphasis added). Thus, although the *Fisher* Court was not faced with the situation at bar—i. e., a subpoena directed to an accountant's workpapers in his possession, responded to by an assertion of the accountant's Fifth

Amendment privilege—the Court seemed to imply that such an assertion would not be availing to the accountant, on three theories: 1) The accountant was not compelled by the Government to write said papers; 2) The mere act of responding to the subpoena does not constitute authentication of the documents, thereby constituting "testimony" within the meaning of the Fifth Amendment; 3) Accountants' workpapers are not the type of documents which are inherently self-incriminatory.

The Ninth Circuit, relying on *Fisher*, would likewise appear to be of the opinion that responding to a subpoena with respect to an accountant's workpapers does not fall within the ambit of the Fifth Amendment. In *Matter of Fred R. Witte Center Glass No. 3*, 544 F.2d 1026 (9th Cir. 1976), the Government served a grand jury subpoena upon the custodian of a target corporation relating to the accountant's workpapers of that corporation, who in turn asserted his Fifth Amendment privilege. The Ninth Circuit held that the Fifth Amendment privilege was not available to the custodian. He sought to distinguish *Fisher* on the basis that, as a matter of state law, he was now the legal owner of the accountant's papers, and therefore the workpapers were being subpoenaed directly from the party claiming the Fifth Amendment. The Ninth Circuit rejected the distinction, stating:

. . . *Fisher* was decided specifically on the basis that the taxpayer would have had no Fifth Amendment privilege if he had held the workpapers himself (and therefore the workpapers were also not privileged in the hands of the attorney.) [cites omitted].

544 F.2d at 1028. On that basis I would have to believe that the Ninth Circuit, to whom I am answerable, would hold that Bardier cannot assert the Fifth Amendment with respect to his own workpapers under his custody, in response to a Grand Jury subpoena.[8]

 It would seem to me that an even more compelling reason exists in the case at bar to support a holding that Bardier is not entitled to assert his Fifth Amendment privilege. With respect to documentary material under subpoena, the Fifth Amendment privilege goes only to a witness' private personal papers. See *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Fisher, supra*, 425 U.S. at 414, 96 S.Ct. at 1582; *United States v. Hankins*, 565 F.2d 1344, 1348–1349 (5th Cir. 1978). In the case at bar, Bardier is one member of a limited partnership, Bardier, Nelson and Tolotti, Ltd. The preparation of the workpapers with respect to Agosto's tax return clearly was done within the course and scope of that business. The papers were drawn up for Agosto's benefit as well as for Bardier's. Accordingly, the papers could not be held to be the accountant's "private papers," such as to implicate the Fifth Amendment. Cf. *Hankins, Id.*[9] Moreover, while the government directed the subpoena to Bardier personally, it just as easily could have directed the subpoena to "the custodian of records of Bardier, Nelson & Tolotti, Ltd.", and in that instance Bardier, as custodian, could not have claimed the Fifth Amendment privilege with respect to the workpapers, even if they were to incriminate him personally. *Bellis*

---

**8.** Nothing in *Grand Jury Subpoena Duces Tecum Served Upon John Doe*, 466 F.Supp. 325 (S.D.N.Y.1979), relied upon heavily by the witness, would change this result. That case involved a grand jury subpoena served upon the target of the investigation, seeking records received by him from various labor union officials concerning illegal payments in connection with the operation of a stevedoring company. The Court quashed the subpoena upon Fifth Amendment grounds, but in so doing stated: "We are not dealing, in this case, with accountant's workpapers which are prepared by the accountant for his benefit to aid in his prepara-

tion of tax returns. Rather, the documents sought . . . were prepared for the target's benefit to memorialize transactions in which he engaged. In this sense, they are his personal papers and compelling their production will, in essence, compel him to be a witness against himself, just as it would if his own signature were on the documents. [cite omitted]" 466 F.Supp. at 327.

**9.** This would appear to be Justices Brennan's and Marshall's precise basis of concurrence in the result in *Fisher, supra*. See: 425 U.S. at 414, 430, 96 S.Ct. at 1583, 1590.

*v. United States*, 417 U.S. 85, 88–89, 94 S.Ct. 2179, 2183, 40 L.Ed.2d 678 (1974). Thus, to hold that the workpapers in the case at bar are Bardier's "private papers" is to rule impliedly to the contrary of the *Bellis* opinion.

For these reasons, then, Bardier cannot refuse to comply with the grand jury subpoena at bar on the basis of the Fifth Amendment.

### 4. Overbreadth (Bardier)

 Finally, the witness Bardier argues that Item # 17 of his subpoena, requiring him to produce "all other records not specifically enumerated above which reflect or are related to the financial activities of those [fourteen] individuals or entities listed" is so overbroad that he cannot possibly know what records and documents are sought therein, and the demand is so onerous in its burden as to be out of proportion to the end sought.

The Court agrees. When the reasonableness of a grand jury subpoena is challenged, one of the tests the subpoena must meet under F.R.Cr.P. Rule 17(c) is that the subpoena describe the materials to be produced with reasonable particularity. *In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F.Supp. 1078, 1084 (S.D.N.Y.1978). This item, in effect, seeks every record in Bardier's possession viz. fourteen individuals or entities over a six-year period. In *Margoles v. United States*, 402 F.2d 450 (7th Cir. 1968) the Seventh Circuit held that the lower court did not err in concluding that a subpoena, seeking any and all equipment logs of a local FBI office relating to the utilization of electronic eavesdropping equipment over a specified one and one-half year period, was unreasonable and therefore subject to being quashed. 402 F.2d at 451. Item # 17 of this subpoena is just as unreasonable.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law, and the Court shall enter an Order forthwith consistent with this Decision.