**In the Matter of the Grand Jury Subpoena Served Upon Pedro ARCHULETA.**

**No. M11–188.**

United States District Court, S. D. New York.

June 14, 1977.

See also, 432 F.Supp. 583.

Robert B. Fiske, Jr., U. S. Atty., New York City, for plaintiff; Thomas E. Engel, Asst. U. S. Atty., New York City, of counsel.

Joan Friedland, c/o Center for Constitutional Rights, New York City, for defendant; Jose A. Lugo, New York City, Dennis Cunningham, Buffalo, N. Y., of counsel.

LASKER, District Judge.

Pedro Archuleta was summoned to appear before a grand jury in this district on April 4, 1977. Prior to his appearance date he moved to quash the subpoena on various grounds. Oral argument on the motion to quash was held April 22, 1977, at which time Assistant United States Attorney Thomas Engel stated:

"I want to put the movants on notice at this time that if they have evidence of illegal electronic surveillance, they ought to bring it forward and they would not [sic] be dilatory in their motions and if they have evidence, it had better be from this date forward and not from here all the way back to 1974." (Tr. at 24).

On May 4, 1977 Archuleta, though "previously under the impression that a claim of illegal electronic surveillance in the grand jury context would be raised when, and if, certain questions were posed which Movant had reason to believe were based on information derived from illegal electronic surveillance,"[1] moved to quash the subpoena itself on the ground that it resulted from information gathered by illegal electronic surveillance. The original motion to quash was denied in a memorandum opinion responded at 432 F.Supp. 583 (1977), which did not address the claim of illegal surveillance. Familiarity with the earlier memorandum is assumed.

The government has responded with three arguments: (1) Archuleta has failed to make a colorable showing of illegal electronic surveillance and accordingly no governmental response is required; (2) Archuleta is not entitled to litigate questions

of illegal electronic surveillance until and unless the government moves to hold him in contempt; and (3) in any event, the affidavits filed by A.U.S.A. Engel and several F.B.I. agents meet the government's burden of affirming or, as in this case, denying use or knowledge of any electronic surveillance, legal or illegal, by those in charge of this investigation.

## I.

The first argument must be rejected. Movant's affidavits, which at this stage of the proceedings the government agrees must be taken as true, establish the following. For a year and a half prior to being subpoenaed to Chicago in November, 1976, Archuleta "heard strange sounds on the telephone . . . and also an echoing sound, and my attorneys and other people have made the same complaint to me." In an affidavit filed before the court in Chicago and incorporated in the moving papers here, Joan Friedland, one of Archuleta's attorneys, stated that since her representation of Archuleta began on November 23, 1976, she has heard "strange clicks and beeps" in her phone conversations with lawyers and other persons "connected with representing" Archuleta on both her home and office phones. In addition, she stated that "there is often a hollow, echoing sound from my telephone [which has] worsened during the time since November 23, 1976." Archuleta's supplemental affidavit swears that during the summer of 1976 a business associate gave him a phone number in Colorado at which he could be reached, and that Archuleta telephoned him at this number three times in October, 1976. In early 1977, Archuleta learned that one Mary Lujan, whose home he had telephoned to speak with his associate, had been questioned by the F.B.I. regarding her knowledge of Pedro Archuleta and the phone calls which he made to the telephone in her house. Archuleta's affidavit goes on to state that he

1. Affidavit of Joan Friedland, ¶ 2, annexed to "Amendment to Motion to Quash the Subpoena."

had not spoken to any other persons concerning his phone calls to that telephone number, and his belief that the F.B.I. could have obtained the information only through use of illegal electronic surveillance. Mary Lujan, a teacher of handicapped children in Del Norte, Colorado, filed an affidavit supporting the recital of Archuleta's supplemental affidavit.[2]

On June 2, 1977 additional affidavits in support of Archuleta's motion were filed by two of his attorneys. Joan Friedland's supplemental affidavit states that since March 29, 1977 (the date on which this grand jury subpoena was issued) she has had numerous difficulties with phone calls made in connection with her representation of Archuleta, to wit, the sound of persons picking up the phone and hanging up even though the party called subsequently stated that they had not done so; high-pitched sounds on the line resembling the noise of a tape recorder running at high speed; continued echoes, clicks and unknown voices in the background of her calls. The affidavit of Doris Peterson, a staff attorney at the Center for Constitutional Rights in New York City involved in representing Archuleta in connection with the instant grand jury proceedings, states that:

"3. On April 16, 1977 I flew to Albuquerque New Mexico to consult with Mr. Archuleta in connection with his grand jury case. When I arrived in Albuquerque on April 15, 1977 [sic] I rented a car and traveled in it with Jose A. Lugo, another CCR staff attorney to see our client at his home in Tierra Amarillo, New Mexico.

4. As we were late for out appointment, we stopped at a roadside telephone on the outskirts of Santa Fe, New Mexico, to telephone Mr. Archuleta to tell him that we would be late.

5. I called Mr. Archuleta at La Cooperacion where he works, area code (505) 588–7601 and charged the number to my CCR credit card.

6. I heard men's voices talking and heard someone say, "Pedro has left" before I even said "hello."

7. I kept saying, "hello," "hello," "hello."

8. There was no answer and when it became clear that no one had answered the phone, I got the operator, explained my difficulty and was connected with La Cooperacion.

9. A woman answered La Cooperacion's telephone and told me that Mr. Archuleta had gone home and would wait there for us.

10. I made this call from a telephone in area code 505. The number on the telephone was 983.9820.

11. The strange happenings described above where I could hear the voices of men talking lead me to believe that electronic surveillance was being conducted in connection with La Cooperacion's telephone."

Although neither the supplemental Friedland affidavit nor the Peterson affidavit involve occurrences before this subpoena was issued, they support an inference that in the recent past phone conversations with Archuleta may have been tapped which in turn supports an inference that tapping may have occurred prior to issuance of the subpoena.

Where the government does not admit illegal wiretapping, it is difficult to imagine how a movant can do better than make the colorable showing of possible illegal electronic surveillance that has been made here. *Comp. United States v. Alter,* 482 F.2d 1016, 1024–25 (9th Cir. 1973). In addition to the allegations recited above, the affidavits set forth with specificity the names and telephone numbers of persons whose conversations with Archuleta or his attorneys are believed to have been monitored, and the time periods during which the eavesdropping was claimed to have occurred.

---

2. The government's memorandum suggests that this incident may have resulted not from electronic surveillance but from investigative checking of long-distance phone company records. That this may be so does not preclude the possibility of Archuleta's claim being correct.

These allegations meet the standards set forth in *United States v. Alter, supra,* 482 F.2d at 1016, adopted by implication in *In re Buscaglia,* 518 F.2d 77, 78 (2d Cir. 1975), for a "*prima facie* showing" of illegal electronic surveillance requiring the government, under 18 U.S.C. § 3504 either to "affirm or deny" the existence of unlawful conduct.

## II.

■ *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) and *Calandra v. United States,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), however, support the government's current position that the present posture of the case is inappropriate for adjudication of the claims of illegal electronic surveillance. *Calandra,* in our view, stands for the proposition that a grand jury witness lacks standing to move to suppress evidence received by the grand jury, or a grand jury subpoena, and may not refuse to answer questions put to him by the grand jury, on grounds that they are based on or derived from evidence illegally obtained in violation of the Constitution. Although *Calandra* involved a suppression motion not directed at the subpoena itself, a heavier burden lies on one seeking to suppress a testimonial subpoena than on one objecting to answering specific questions. 432 F.Supp. 583, at 593–94. If the constitutional exclusionary rule is not available on a motion to quash specific questions put by the grand jury, then *a fortiori* it is unavailable as a basis for a motion to quash a testimonial subpoena.

Thus, if Archuleta is entitled to litigate his claims of illegal electronic surveillance his standing to do so must be derived from the governing statute. In *Gelbard v. United States, supra,* 408 U.S. 41, 92 S.Ct. 2357, the Court held that in *defense* of a contempt charge a grand jury witness could

invoke 18 U.S.C. § 2515,[3] which bars the use of evidence before official bodies, including grand juries, of the contents and fruits of illegal wiretapping, and put the government to its burden of disclosing any possibly illegal wiretaps.

The Court reasoned that the purposes of Title III of the Omnibus Crime Control and Safe Streets Act of 1968

"would be subverted were the plain command of § 2515 ignored when the victim of an illegal interception is called as a witness before a grand jury and asked questions based upon that interception. Moreover, § 2515 serves not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct . . . Consequently, to order a grand jury witness on pain of imprisonment, to disclose evidence that § 2515 bars in unequivocal terms is both to thwart the congressional objective of protecting individual privacy by excluding such evidence and to entangle the courts in the illegal acts of Government agents." 408 U.S. at 51, 92 S.Ct. at 2262–2263.

In addition, 18 U.S.C. § 3504, which "upon a claim by a party aggrieved that evidence is inadmissible" because of an illegal interception, requires the government to affirm or deny the illegal act, was found by the Court to "confir[m]" that Congress meant that grand jury witnesses might defend contempt charges by invoking the prohibition of § 2515 against the compelled disclosure of evidence obtained in violation of Title III." 408 U.S. at 55, 92 S.Ct. at 2364.

The government in *Gelbard* had argued that while standing alone § 2515 could be construed to allow a grand jury witness to invoke its prohibition as a defense to contempt, Congress could not have intended this result since in § 2518(10)(a)[4] it exclud-

**3.** Section 2515 provides in full:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury,

department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

**4.** Section 2518(10)(a) provides that:

ed grand juries from the list of proceedings in which aggrieved persons could move to suppress evidence obtained through illegal eavesdropping. Although apparently agreeing with the government that grand juries had been intentionally excluded from the statutory suppression hearing procedure provided for in § 2518(10), 408 U.S. at 59 n. 19, 92 S.Ct. at 2366–2367, the court disagreed with the government's conclusion:

> "[I]t does not follow from the asserted omission of grand jury proceedings from the suppression provision that grand jury witnesses cannot invoke § 2515 as a defense in a contempt proceeding under 28 U.S.C. § 1826(a). The congressional concern with the applicability of § 2518(10)(a) in grand jury proceedings . . . was . . . that defendants and potential defendants might be able to utilize suppression motions to impede the issuance of indictments . . . .. The 'general rule,' . . . is that a defendant is not entitled to have his indictment dismissed . . . simply because the Government 'acquire[d] incriminating evidence in violation of the [law],' even if the 'tainted evidence was presented to the grand jury.' [citation omitted] But that rule has nothing whatever to do with the situation of a grand jury witness who has refused to testify and attempts to defend a subsequent charge of contempt." 408 U.S. at 59–60, 92 S.Ct. at 2366–2377.

It went on to note that the "usual procedure" by which grand jury witnesses discovery whether they may refuse to answer

questions is "upon the Government's motion, to have a court order a grand jury witness to testify upon penalty of contempt for noncompliance. . . . The asserted omission of grand jury proceedings from § 2518(10)(a) may well reflect congressional acceptance of that procedure as adequate in these cases." 408 U.S. at 60–61, 92 S.Ct. at 2367.

The Court's discussion, while concededly not deciding the point, strongly suggests that a grand jury witness' statutory right to litigate claims of illegal electronic surveillance arises only in defense to a motion to hold the witness in contempt. This view is supported by the language of § 2515, which the Court found to be the basis for the witness' defense. It provides that "no part of the contents of such communication [unauthorized electronic eavesdropping] and no evidence derived therefrom *may be received in evidence* . . . before any court [or] grand jury . . . ." (emphasis added). A grand jury does not 'receive evidence' on a testimonial subpoena until and unless the witness answers questions. Requiring a witness to comply with a testimonial subpoena to the extent of appearing before the grand jury and making specific objections to answering particular questions involves no possibility of violating § 2515.

Accordingly, we hold that the witness has no present right to litigate whether he was the victim of illegal electronic eavesdropping and whether that eavesdropping tainted these grand jury proceedings. Of course, there may be circumstances in

---

"(10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Such motion shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice."

which considerations of judicial economy suggest that the challenge should be litigated on a motion to quash a subpoena. In *In re Mintzer,* 511 F.2d 471, 472 (1st Cir. 1974), the Court of Appeals noted that

"The district court had, in an effort to expedite matters, permitted the witness to seek government affirmance or denial of wiretapping, under 18 U.S.C. § 3504, prior to his grand jury appearance. This was not required, because appellant was not yet an 'aggrieved person' as defined by the statute. *Gelbard v. United States,* 408 U.S. 41, 54 [92 S.Ct. 2357, 33 L.Ed.2d 179] (1972); see *In re Lochiatto,* 497 F.2d 803, 806 (1st Cir. 1974). But the district judge reasoned that time would be saved by extending the privilege before the witness was brought before the grand jury."

In this case, however, the context suggests the possibility that the witness may challenge specific questions on grounds of illegal electronic surveillance even if the motion to quash the subpoena on these grounds is denied on the merits. Thus, concern for judicial economy requires holding in abeyance any consideration of the electronic surveillance claims on their merits until such time as the government may seek to hold the witness in contempt.

### III.

■ The government's apparent reversal of position concerning the appropriate time for moving with respect to claims of illegal electronic surveillance is understandable in light of the recent Court of Appeals decision in *United States v. Yanagita,* 552 F.2d 940 (2d Cir. 1977), where the court held that "a claim under § 3504 [must] be asserted promptly upon the witness' having a reasonable basis for doing so and may be waived by his failure to avail himself of an opportunity to make such a timely assertion after he has gained knowledge of facts providing a reasonable basis for the claim." Although the court also indicated that timeliness was of less urgency in raising such claims before a grand jury than in an ongoing criminal trial, the reasons for requiring timely assertion—in particular, allowing the government sufficient time to make a full and complete agency check—support the government's position here that Archuleta set forth at present those facts known to him which indicate the possibility of illegal surveillance, so that when the time arrives for adjudication of the claim, the government can be prepared with appropriate and complete responses.

■ That being the nature of the government's concern, it is only appropriate that we indicate our views on the adequacy of the response put in this far by the government. Although we make no holding on this point, the affidavits submitted by Archuleta and the nature of the investigation of which he is a part as revealed in earlier papers filed with the court suggest that an appropriate government response should include either denial or affirmance of electronic surveillance in New Mexico (which may have directly or indirectly provided federal officials with information forming the basis either for the subpoena or specific questions), together with appropriate affidavits from officials in those localities in which specific claims supporting an inference of wiretapping have been made.

### IV.

■ Archuleta has also moved to stay execution of the subpoena until the government has submitted the report on possibly wrongful disclosure of information to the press required by our earlier decision. However, as set forth at length in that opinion, quashing a subpoena is not the appropriate remedy for wrongdoing in connection with disclosures to the press in violation of federal rules. Indeed, the purpose of ordering the report was to determine, if possible, who the responsible persons were in order that sanctions may be imposed on them. Accordingly, no legitimate purpose would be served by staying the subpoena.

For all the foregoing, Archuleta's motions to quash the subpoena and/or to stay its execution are denied.

It is so ordered.