**In re GRAND JURY INVESTIGATION**

No. 04GJ4381.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 6, 2006.

James P. Gillis, Assistant U.S. Attorney, U.S. Attorney's Office, Alexandria, VA, for the government.

## MEMORANDUM OPINION

ELLIS, District Judge.

At issue in this grand jury proceeding is whether a non-target witness in a grand jury proceeding or the witness' former spouse, who is a potential target, may (i) quash the witness' subpoena by asserting that the questions expected to be posed to the witness in the grand jury proceeding are the fruit of illegal electronic surveillance; or (ii) require the government to affirm or deny the existence of illegal electronic surveillance on the basis of mere speculation that such surveillance occurred. Also at issue is whether the non-witness ex-spouse may quash the witness' subpoena on the basis of the marital privilege, the breadth of which the parties dispute.

### I.[1]

John Doe and Mary Roe were married on March 13, 1999 and barely seven months later, on November 2, 1999, they

---

1. Because this grand jury proceeding is ongoing, this Memorandum Opinion will not refer to the parties by their proper names. Also, the facts recited are limited to those required to frame the questions presented.

separated permanently. Their divorce became final in January 2003.

John Doe was subpoenaed to testify before a federal grand jury in the Eastern District of Virginia on March 3, 2006. He believes that this subpoena relates to a possible criminal investigation of his ex-wife for violations of 18 U.S.C. § 951.[2] This belief is based on the following allegations:

(i) A physical search of Mary Roe's home was conducted pursuant to an investigation into possible violations of 18 U.S.C. § 951;

(ii) Mary Roe has traveled extensively throughout the Middle East;

(iii) Mary Roe is an expert on Middle East politics and history, and has lectured and written on the subject;

(iv) Some of Mary Roe's writings and lectures have been viewed as controversial and overly sympathetic to Palestinian interests; and

(v) As part of her academic work, Mary Roe has interviewed members of Hamas, considered a terrorist organization by the United States government.[3]

On the basis of these facts, John Doe speculates that his ex-wife is a target of the grand jury's investigation, and further that owing to the nature of her work, she has been the subject of warrantless NSA surveillance pursuant to the program authorized by President Bush shortly after September 11, 2001 ("NSA Program").[4]

Citing 18 U.S.C. § 2515 and *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), John Doe has moved to quash his subpoena on the ground that he believes he will be asked questions derived from the NSA Program's illegal electronic surveillance of his ex-spouse. As a necessary predicate for this motion, he has also moved for the disclosure of any warrantless electronic surveillance of his ex-spouse that is the basis of the grand jury investigation.

Mary Roe has also moved to quash the subpoena served on her ex-husband, based both on the alleged illegality of possible electronic surveillance, and on the privilege protecting confidential communications between husband and wife during marriage. Mary Roe, like her ex-husband, has also moved for the disclosure of any warrantless NSA electronic surveillance of her that may be the basis of any grand jury questioning of her ex-spouse.

## II.

■ In general, a grand jury witness may not avoid his duty to testify because the questions are based on evidence obtained in violation of the witness' Fourth Amendment rights. *See United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). This general rule is based on the sensible notion that because any illegally obtained evidence or the fruits of such evidence will be excluded from the criminal trial, the incremental deterrent effect on government misconduct

---

**2.** This statute provides, in pertinent part, as follows:

Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.

**3.** *See* 31 C.F.R. Ch. V, App. A. (effective June 23, 2005) (listing HAMAS as a specially designated terrorist, foreign terrorist organization, and specially designated global terrorist).

**4.** This program has been the subject of considerable recent media attention. *See, e.g.,* James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times, December 16, 2005, at A1. *See also Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F.Supp.2d 30 (D.D.C.2006) (describing the NSA Program).

by excluding such questions at the grand jury stage is outweighed by the undue "interference with the effective and expeditious discharge of the grand jury's duties." *Id.* at 350–51, 94 S.Ct. 613. As the Supreme Court in *Calandra* stated:

Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial. Permitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings.

*Id.* at 349, 94 S.Ct. 613.

This general rule is not without its limits. A grand jury may not itself violate a valid privilege, whether established by common law, statute or the Constitution. *Id.* at 346, 94 S.Ct. 613 (citing *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)). For example, a grand jury may not override a witness's Fifth Amendment privilege against self-incrimination without a grant of immunity co-extensive with the privilege. *Id.* (citing *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). Nor may a grand jury itself violate the

Fourth Amendment by issuing a subpoena *duces tecum* "too sweeping in its terms to be regarded as reasonable." *Id.* (citing *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906)). Also, district courts have the power to grant a witness' motion to quash subpoenas for documents or objects if compliance would be "unreasonable or oppressive." *Id.* at 346 & n. 4, 94 S.Ct. 613 (citing Fed.R.Crim.P. 17(c)).

John Doe's and Mary Roe's motions to quash Doe's subpoena do not rely on any of these well-recognized exceptions, but rely instead on the Supreme Court's decision in *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). There, a slim majority [5] held that a grand jury witness could defend against a contempt citation for refusal to testify before a grand jury by invoking the government's violation of 18 U.S.C. § 2515,[6] the evidentiary prohibition of Title III of the Omnibus Crime and Control Act of 1968, as "just cause" for such refusal.[7] *Id.* at 52, 92 S.Ct. 2357. Justice Brennan, writing for the majority, based this holding, in part, on § 2515's "fundamental policy" of preventing illegal electronic surveillance from invading an individual's privacy interest and entangling the courts in illegal acts. *Id.* at 51, 92 S.Ct. 2357.[8] He also noted that the result was buttressed by the passage of 18 U.S.C. § 3504, which requires

---

**5.** *Gelbard* was a 5 to 4 decision with Justice Brennan writing the majority opinion, Justices White and Douglas adding concurring opinions, and Justice Rehnquist writing for the dissenters.

**6.** This statute provides, in pertinent part, that

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States ... if the disclo-

sure of that information would be in violation of this chapter.

18 U.S.C. § 2515.

**7.** A district court may hold a recalcitrant witness in contempt pursuant to 28 U.S.C. § 1826(a) "[w]henever a witness in any proceeding before or ancillary to any court or grand jury of the United States *refuses without just cause* shown to comply with an order of the court to testify ...." (emphasis added).

**8.** For purposes of its analysis, Justice Brennan's opinion in *Gelbard* simply assumed the existence of illegal electronic surveillance. *See Gelbard*, 408 U.S. at 46–47, 92 S.Ct. 2357.

the government to affirm or deny the existence of illegal electronic surveillance in grand jury and other proceedings "upon the claim of a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act." 18 U.S.C. § 3504(a). In this respect, an "unlawful act" is defined by the statute as "the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto." 18 U.S.C. § 3504(b). According to Justice Brennan, this section, which he construed as a mechanism for enforcing § 2515, "confirms that Congress meant that grand jury witnesses might defend contempt charges by invoking the prohibition of § 2515 against the compelled disclosure of evidence obtained in violation of Title III.." *Gelbard,* 408 U.S. at 55, 92 S.Ct. 2357. Doe and Roe rely exclusively on *Gelbard's* holding as the basis for their motion to quash.

### A.

Movants' reliance on *Gelbard* is misplaced as that decision is properly limited to the precise procedural posture in which it was presented, namely grand jury witnesses defending against contempt charges stemming from a refusal to testify. Nothing in *Gelbard* warrants the conclusion, advocated here by movants, that motions to suppress, disguised as motions to quash, are cognizable in grand jury proceedings. Indeed, Justice Brennan, pressed by a strong dissent by then Justice Rehnquist, was careful to limit the *Gelbard* holding to grand jury witnesses defending against contempt proceedings by expressly acknowledging that (1) a motion to suppress pursuant to 18 U.S.C. § 2518(10)(a)[9] is unavailable in grand jury proceedings, and (2) that this subsection reflected a "congressional concern ... that defendants and potential defendants might be able to utilize suppression motions to impede the issuance of indictments...." *Id.* at 59–60, 92 S.Ct. 2357. Additionally, he went on to affirm that "[n]ormally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforceable by an individual," and that when Congress enacted Title III, it did so with "no intent to change this general rule." *Id.* at 60, 92 S.Ct. 2357 (quoting *United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966) and citing S.Rep.No.1097, 90th Cong., 2d Sess., 106 (1968); U.S.Code Cong. & Admin.News, p. 2195). Only because this "general rule has nothing whatever to do with the situation of a grand jury witness who has refused to testify and attempts to defend a subsequent charge of contempt," did the *Gelbard* majority hold that the general proscription contained in § 2515 is available as a defense in a contempt proceeding. *Id.*[10]

---

**9.** This statute provides, in pertinent part, that—

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
>
> (i) the communication was unlawfully intercepted....

18 U.S.C. § 2518(10)(a).

**10.** As Justice Brennan further explained:

> [G]rand jury witnesses do not normally discover whether they may refuse to answer questions by filing motions to suppress their potential testimony. The usual procedure is, upon the Government's motion, to have a court order a grand jury witness to testify upon penalty of contempt for noncompliance. Section 1826(a) [of Title 28] embodies that traditional procedure. The asserted omission of grand jury proceedings from

In sum, *Gelbard* is properly limited to its facts and thus applies only to grand jury witnesses who, after refusing to testify, seek to show good cause for doing so as a defense to a contempt citation and imprisonment.[11] As such, *Gelbard* is of no aid to these movants; neither has refused to testify and neither is the subject of either a show cause order or a contempt citation. Limiting *Gelbard* in this respect is appropriate because, as Justice Rehnquist's dissent warns, allowing suppression issues to be imported into grand jury proceedings disguised as motions to quash would spawn satellite litigation on issues properly resolved in post-indictment proceedings and thereby cause "interminable delay but add nothing to the assurance of a fair trial." *See Id.* at 77, 92 S.Ct. 2357 (Rehnquist, J., dissenting) (quoting *Costello v. United States*, 350 U.S. 359, 364, 76 S.Ct. 406, 100 L.Ed. 397 (1956)).

Nor is it persuasive to argue that limiting *Gelbard* to contempt proceedings is an illusory procedural distinction without any substantive effect. To the contrary, there is much of consequence and substance that separates a witness who has not yet heard any questions from one who has heard the specific questions, that, if not answered, will serve as the basis for a contempt citation. Simply put, the questions allegedly based on electronic surveillance are entirely conjectural at the motion to quash stage, whereas contempt proceedings involve a witness' refusal to answer actual questions. This distinction thus provides two reasons for delaying any hearing on whether grand jury questions are based on possible illegal electronic surveillance until a contempt proceeding: First, the need for the hearing may be obviated altogether when the witness decides upon hearing the questions that his suspicions of illegal electronic surveillance are unfounded. Second, delaying the hearing until after actual questions have been asked will relieve courts from deciding unripe issues of a speculative nature and dimension.

It is not surprising, therefore, that courts confronting this question have declined to read *Gelbard*, as movants advocate, to allow a grand jury witness to litigate suppression issues by way of a motion to quash a witness subpoena. *See supra* note 11. Nor does the Third Circuit's decision in *In re Grand Jury*, 111 F.3d 1066 (3rd Cir.1997), provide a persuasive reason to reach a different result. That case involved the victim of a privately executed illegal wiretap who moved to quash a subpoena *duces tecum* directing the perpetrator to provide recordings of the victim's conversations. *Id.* at 1068. Finding "nothing in the language or structure of Rule 17(c) or Title III suggesting that Rule 17(c) cannot be used by a victim of an unlawful interception to protect his or her privacy interests under Title III," the Third Circuit held "that rule 17(c) [Fed.R.Crim.P.] provides a cause of action for an aggrieved person to move to quash a grand jury subpoena *duces tecum* compliance with which would violate §§ 2515 and 2511(c)." *Id.* at 1075–76. Even accepting the Third Circuit's construction of Rule 17(c) with regard to a subpoena *duces*

---

§ 2518(10)(a) may well reflect congressional acceptance of that procedure as adequate in these cases. *Id.* at 60–61, 92 S.Ct. 2357.

11. Although the Fourth Circuit has not squarely addressed this issue, other district courts that have done so have likewise sensibly refused to extend *Gelbard's* holding to motions to quash by a witness. *See Matter of Archuleta*, 434 F.Supp. 325, 329–30 (S.D.N.Y. 1977) (holding that a "grand jury witness' statutory right to litigate claims of illegal electronic surveillance arises only in defense to a motion to hold the witness in contempt."); *Birdseye v. United States*, 676 F.Supp. 87, 87 (W.D.Pa.1987) (same); *In re Grand Jury Proceedings of Dzikowich*, 620 F.Supp. 521, 524 (W.D.Wis.1985) (same).

*tecum,* it is clear from the language of Rule 17(c) that the rule applies only to subpoenas *duces tecum,* and does not provide a "cause of action" for grand jury witnesses who claim that the questions they may be asked might be based on illegal electronic surveillance.

 Thus, neither *Gelbard* and its progeny, nor any other authority found, supports movants' efforts to use a motion to quash as a means of litigating suppression issues in a grand jury proceeding. The proper time to litigate the suppression issue is the post-indictment, pre-trial stage, should that ever occur.[12]

### B.

Although not labeled as such, John Doe's and Mary Roe's motions for disclosure of electronic surveillance are properly construed as "claims" made pursuant to 18 U.S.C. § 3504(a), and as necessary predicates to the movants' attempt to enforce the prohibition of § 2515. To prevent the abuse of this mechanism, the Fourth Circuit has made clear that in order to compel the opponent of a claim, here the United States, to affirm or deny the occurrence of illegal electronic surveillance, the proponent must make a cognizable "claim" and demonstrate that he or she is an "aggrieved" party. In this regard, "[a] cognizable 'claim' need be no more than a 'mere assertion,' provided that it is a positive statement that illegal surveillance has taken place." *United States v. Apple,* 915 F.2d 899, 905 (4th Cir.1990) (citing *United States v. Tucker,* 526 F.2d 279, 282 & n. 4 (5th Cir.1976)). The Fourth Circuit's requirement for demonstrating that a party

is an "aggrieved person" is more demanding. Under this standard a party must make a prima facie showing that "he was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises." *Id.*[13] Unlike the showing required to make a claim of illegal electronic surveillance, the showing required to demonstrate that a party is "aggrieved" by the surveillance "may not be based on mere suspicion; it must have at least a 'colorable basis.'" *Id.* (citing *United States v. Pacella,* 622 F.2d 640, 643 (2d Cir.1980)).

The Fourth Circuit's decision in *Apple* vividly illustrates the demanding nature of the showing a claimant must make under § 3504. There, the Fourth Circuit held that a criminal defendant had not made a prima facie showing that he was an "aggrieved person" for purposes of § 3504(a) despite (i) the averment of his counsel that the defendant had told counsel that defendant had spoken regularly to a friend whose telephone was known to be wiretapped, and (ii) defendant's citation to his grand jury testimony in which he stated that he spoke regularly to the same friend by telephone. Thus, despite the uncontested existence of a tapped telephone, the defendant had failed to prove he was an "aggrieved person" because he "never averred that he completed telephone calls to the number known to have been tapped during the period that surveillance took place." *Id.* at 907. The Fourth Circuit dismissed the defendant's citation to his grand jury testimony as "mere suspicion"

---

**12.** *See* 18 U.S.C. 2518(10)(a). Targets of the alleged illegal electronic surveillance may also pursue a cause of action for violation of their Fourth Amendment rights pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Zweibon v. Mitchell,* 516 F.2d 594 (1975).

**13.** Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No. 90–351, 82 Stat. 211 (1968), *codified at* 18 U.S.C. § 2510 *et seq.,* similarly defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

that he might have talked on the tapped phone during the relevant time, and likewise dismissed his counsel's affidavit because it "fail[ed] to identify whether any *specific* calls were completed to [the wiretapped] phone." *Id.* (emphasis added). Finally, the Fourth Circuit noted the fact that the defendant had failed to produce any phone records demonstrating that he had placed calls to the wire-tapped phone. *Id.* Thus, the Fourth Circuit's requirements for demonstrating a prima facie case that a person is "aggrieved" for purposes of § 3504(a) demand that the person set forth specific facts to show that he or she was a party to an intercepted conversation, that the surveillance was directed at him, or that the intercepted communications took place at his premises.[14]

■ Under this standard, neither John Doe nor Mary Roe have set forth the facts necessary to be considered an "aggrieved person" under § 3504, and therefore the government is not required to affirm or deny the existence of any illegal electronic surveillance. John Doe has not even alleged that he was the target of the NSA Program, and although Mary Roe has made such allegations, she has not done so with the level of specificity required by *Apple.* Put simply, bare allegations that the government has been intercepting communications through illegal electronic surveillance will not trigger the requirement that the government affirm or deny those allegations. While recognizing the difficulty this standard presents to a wit-

ness who suspects conduct which is by its nature secret, it is also true that "unsubstantiated allegations are too easily made to justify the expense and delay which would result from requiring the government to dispel every allegation, no matter how frivolous." *In re Grand Jury Proceedings (Macklen),* 525 F.Supp. 831, 833 (D.S.C.1981). Thus, although a movant may require the government, in appropriate circumstances, to disclose whether the movant has been the subject of illegal electronic surveillance, the movants here have failed to make the necessary prima facie showing of a "claim" by an "aggrieved party" and therefore their motions for disclosure of electronic surveillance pursuant to 18 U.S.C. § 3504(a) must be denied.

**C.**

■ Finally, John Doe's and Mary Roe's motions for disclosure of electronic surveillance may also be construed as a request made pursuant to the notification procedure contained in the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. § 1806(c). This statute provides that—

> Whenever the Government intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to the authority of this

---

**14.** The Fourth Circuit's demanding standard for § 3504(a) is consistent with the decisions of other courts that have considered the issue. *See, e.g., United States v. Yanagita,* 552 F.2d 940, (2d Cir.1977) ("Although the claim need not be particularized, it may not be based upon mere suspicion but must at least appear to have a 'colorable' basis before it may function to trigger the government's obligation to respond under § 3504.") (internal citations omitted); *In re Millow,* 529 F.2d 770, 775 (2d

Cir.1976) ("Unsupported suspicion and patently frivolous assertions of government misconduct do not constitute a 'claim.' "); *United States v. Alter,* 482 F.2d 1016, 1026 (9th Cir. 1973); *In re Grand Jury Proceedings of Dzikowich,* 620 F.Supp. 521, 523 (W.D.Wis.1985) ("[T]he affidavits and accompanying exhibits are little more than the barest form of speculation"); *Matter of Rosado,* 441 F.Supp. 1081, 1085 (S.D.N.Y.1977).

subchapter, the Government shall, prior to the trial, hearing, or other proceeding or at a reasonable time prior to an effort to so disclose or so use that information or submit it in evidence, notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the Government intends to so disclose or use such information.

50 U.S.C. § 1806(c). By its plain terms this provision does not afford either movant a right to notice of any electronic surveillance at the grand jury stage. In contrast to 18 U.S.C. 3504(a), this subsection does not list grand jury proceedings among those which will trigger disclosure of electronic surveillance, and this difference should be presumed to be intentional. As the Fourth Circuit stated in response to a similar request: "[W]e believe the witnesses were not entitled to notice under FISA. Neither the statutory language nor legislative history requires notification prior to *grand jury* questioning." *See In re Grand Jury Proceedings,* 856 F.2d 685, 690 (4th Cir.1988). Thus, the motions for disclosure of electronic surveillance with respect to the grand jury proceedings must also be denied under 50 U.S.C. § 1806(c).

### III.

■ Mary Roe also moves to quash John Doe's grand jury subpoena on the basis of the marital privilege protecting confidential communications that occur between husband and wife during their marriage.[15] In this regard, "[i]t is well-established that confidential marital communications are presumptively privileged." *See United States v. Foresman,* 63 Fed.Appx. 138, 140 (4th Cir.2003). And, it is also well-established that the marital privilege may be invoked during grand jury testimony. *See United States v. Morris,* 988 F.2d 1335, 1337 (4th Cir. 1993). In the present circumstances, however, Roe's motion fails; the assertion of the privilege is premature and cannot, in this case, serve as a basis to quash the subpoena. Rather, John Doe must appear and testify, but may assert the privilege in response to specific questions.

Yet, this does not end the analysis of the issue, as Mary Roe and the government disagree sharply about the breadth of this privilege, and it is expedient to resolve this disagreement here. Specifically, the dispute concerns whether the privilege applies during the period the couple was separated prior to the divorce. Mary Roe argues that the privilege protects not only those communications that occur during the marriage while the parties are cohabitating, but also to communications during a separation if the parties intend to save the marriage and thus expect the separation to be temporary. In Mary Roe's view an evidentiary hearing is necessary to determine in specific circumstances whether communications warrant the protection of the privilege. The government rejects this view of the marital privilege, arguing that a bright line rule limiting the privilege to married couples who have not separated serves the goals of the privilege without presenting district courts with the difficult task of assessing whether separated parties were both genuinely attempting to reconcile and save the marriage during their separation.

■ Analysis of this issue begins with the principle that the privilege only protects information "disclosed between husband and wife in the confidence of the marital relationship." *United States v. Hall,* 989 F.2d 711, 716 & n. 8 (1993).

---

**15.** The marital privilege, in this context, is a matter of federal common law. *See* Rule 501, Fed.R.Evid. *See also S.E.C. v. Lavin,* 111 F.3d 921, 925 (D.C.Cir.1997).

And, for purposes of the privilege, the marital relationship ends not with the formal divorce of the couple, but with their permanent separation. This sensible bright line rule has been adopted by the great majority of courts to have considered the issue.[16] It is sensible because it appropriately accommodates the goals of the privilege while avoiding entangling the courts in difficult and problematic hearings concerning the parties' *bona fides* and the viability of their marriage. Mary Roe's invitation to ignore this authority and engage in such a hearing in this case is thankfully declined.

 Nor is there any doubt as to which side of the bright line rule this case falls. Thus, there is no dispute that the Does were married on March 13, 1999 and permanently separated on November 2, 1999. Indeed, Mary Roe's January 16, 2003 Bill of Complaint for Divorce states as follows:

> [T]he Parties separated on or around November 2, 1999, with the intent at the time for the separation to be permanent. Further, that since November 2, 1999, the Parties have lived separately and apart without any cohabitation and continuously without interruption to the present time, during which period of time they have continued to maintain an intent for their separation to be permanent.[17]

It follows from this recital that the parties may not now be heard to claim that their separation was only intended to be temporary, during which period they intended to attempt to rescue their marriage. To the contrary, this recital confirms the propriety of applying the sensible majority rule that the marital privilege ceases with not just a final divorce decree, but with an earlier permanent separation should one occur, as it did here. It further follows that Mary Roe may only invoke a marital privilege for the period March 13, 1999, the date of their marriage, to November 2, 1999, the date of their permanent separation. Thus, John Doe may be questioned about all communications with his ex-wife except those confidential communications that occurred during the marriage and before the separation.

## IV.

For the reasons stated herein, John Doe's and Mary Roe's motions to quash and for disclosure of electronic surveillance must be denied. Nothing in this ruling precludes John Doe from declining to answer a question calling for discussion of a confidential communication with Mary Roe during the short span of their marriage before their separation. Of course, it is also open to the government in that event to argue, *inter alia,* that the invocation of the privilege is invalid on the basis of the crime-fraud exception. *See United States*

---

16. *See, e.g., United States v. Byrd,* 750 F.2d 585, 593 (7th Cir.1984) ("[O]nly communications that take place during a valid marriage between couples still cohabitating pursuant to that marriage are protected by the privilege."); *United States v. Jackson,* 939 F.2d 625, 627 (8th Cir.1991) ("[T]his privilege does not protect information communicated after the couple has permanently separated."); *United States v. Singleton,* 260 F.3d 1295, 1299 (11th Cir.2001) ("We agree with the other circuits which have determined that the privilege is not available when the parties are permanently separated."). *But see United*

*States v. Roberson,* 859 F.2d 1376, 1381 (9th Cir.1988) (directing district courts to determine whether the differences between the separated couple were irreconcilable); *In re Witness Before Grand Jury,* 791 F.2d 234, 238 (2d Cir.1986) (permitting district courts to consider the irreconcilability of a separated couple).

17. This recital was adopted by the state court in issuing the final divorce decree. *See* Final Decree of Divorce, Case No. CH030066 at 2 (Va.Cir.Ct.Alex. Jan. 31, 2003).

*v. Neal*, 743 F.2d 1441, 1446 (10th Cir. 1984).